BARNES, Presiding Judge.
Rudy Robles, individually and as surviving spouse to Iselda Moreno and as administrator of the estate of Iselda Moreno (collectively, “Robles”), filed this suit against Patricia Yugueros, M.D., and her practice group, Artisan Plastic Surgery, LLC (Artisan), alleging that Dr. Yugueros committed medical malpractice during the postoperative care of Moreno, who died from complications after surgery. *325 Robles appeals from the jury’s verdict and judgment in favor of the defendants. He contends that the trial court erred in excluding Artisan’s admission against interest, among other things. Because we agree that the trial court erred in excluding this evidence and that the error was harmful, we reverse the judgment entered on the defense verdict and remand for a new trial.
The record shows that on June 24,2009, Dr. Yugueros performed a liposuction, buttock augmentation, and abdominoplasty surgery on Moreno at Northside Hospital. Moreno remained in the hospital overnight and was discharged the next day, with a post-operative visit scheduled for June 29, 2009.
On Saturday, June 27, 2009, two days after being discharged, Moreno called Dr. Yugueros at around 7:15 a.m. to report that she was experiencing pain in her upper abdomen and not eating well. Dr. Yugueros believed that Moreno was having gastritis caused by her prescribed medications, so she told Moreno to take only Turns and Tylenol instead. Robles called Dr. Yugueros a few hours later and said his wife was still in pain and he wanted to take her to the hospital. Dr. Yugueros recommended that they go to Northside Hospital, where she had privileges, but they went instead to Gwinnett Medical Center’s (GMC) emergency department, where Moreno complained of severe abdominal pain, nausea, and vomiting.
Moreno was treated in GMC’s emergency department by Dr. Michael Violette, an emergency room physician. Dr. Violette ordered an abdominal x-ray and read it as “unremarkable.” Laboratory tests of Moreno’s blood and urine were ordered, and the results revealed nothing unusual. He also examined Moreno’s abdomen, diagnosed her with post-operative pain, and ordered anti-nausea and pain medication. She was then released from the ER with instructions to return if her symptoms worsened.
Dr. James York, a GMC radiologist, read the same x-ray Dr. Violette had reviewed. He thought it showed possible “free intraperi-toneal air” in her abdomen and recommended a CT scan. “Free air” could be a normal finding in a post-operative patient, but it could also indicate a serious condition. Dr. York’s report was posted to Moreno’s electronic medical record and faxed to GMC’s emergency department shortly after Moreno was discharged, but neither Dr. York nor anyone else from GMC contacted Dr. Violette, Moreno, or Dr. Yugueros about Dr. York’s findings. And no one checked GMC’s fax machine until the following Monday.
Roughly three hours after being discharged from the GMC emergency department, Moreno was still suffering from extreme abdominal pain. Dr. Yugueros instructed Moreno not to return to GMC, but instead, to go to Northside where she had privileges. *326 Following an initial work-up in the Northside emergency room, Dr. Yugueros admitted Moreno for pain control and further evaluation.
Once admitted, Dr. Yugueros ordered that Moreno receive an incentive spirometer to assist her lungs and prescribed pain medications. Moreno’s lab work returned within the normal range. Dr. Yugueros did not order x-rays or a CT scan.
Around 5:15 a.m., Moreno’s nurse called Dr. Yugueros to report that the prescribed medication was not adequate to control Moreno’s pain and that Moreno had concentrated urine and hypoactive bowel sounds. Dr. Yugueros ordered a different pain medication, IV fluids, and medication to help move Moreno’s bowels.
Later that morning, Dr. Yugueros came to Northside and observed Moreno for approximately two hours, inspecting her surgical dressings and palpating her abdomen. Around 2:40 p.m., a nurse contacted Dr. Yugueros because Moreno’s legs were numb and she had to be carried out of the bathroom to bed. Dr. Yugueros instructed the nurse to contact the rapid response team, which decided in concert with Dr. Yugueros to order an abdominal X-ray, an electrocardiogram, and blood tests. Dr. Yugueros also ordered abdominal pressure measurements to rule out abdominal compartment syndrome and ordered an internist consult.
Around 4:00 p.m., a hospitalist contacted the on-call surgeon for a consultation because Moreno’s x-ray showed evidence of abdominal free air. The surgeon had to attend to another emergency patient first, but Moreno went into surgery around 7:10 p.m. The surgeon discovered that Moreno’s stomach had basically torn open and was 95 percent necrotic. Moreno died later that evening.
Robles filed suit against Dr. Yugueros and Artisan, alleging professional and ordinary negligence arising out of Dr. Yugueros’ post-operative medical care and treatment of Moreno. He did not name GMC or any of its doctors or employees as defendants, but Dr. Yugueros and Artisan filed notices designating GMC, Dr. Violette, and Dr. York as nonparties against whom the jury should consider apportioning damages. At the end of the trial, part one of the verdict form allowed the jury to find for either the plaintiff or the defendants, and instructed the jury that if it found for the defendants, it should stop there and sign and return the verdict. If it found for Robles, the jury was instructed to continue to part two regarding the damages award and the apportionment of fault among the defendants and nonparties listed on the verdict form. The jury returned a verdict in favor of Dr. Yugueros and Artisan, and Robles appeals.
Robles argues that the trial court erred in granting Artisan’s motion in limine to exclude a portion of the deposition given by Artisan’s corporate representative in response to Robles’ notice of *327 deposition under OCGA § 9-11-30 (b) (6). We agree the trial court erred in granting the motion, and that the error was harmful.
OCGA § 9-11-30 (b) (6) provides:
A party may, in his or her notice, name as the deponent a public or private corporation or a partnership or association or a governmental agency and designate with reasonable particularity the matters on which examination is requested. The organization so named shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which he or she will testify. The persons so designated shall testify as to matters known or reasonably available to the organization. . . .
(Emphasis supplied.) In Robles’ notice of deposition, he asked Artisan to designate someone who has “the most complete knowledge and [is] best informed as to the following areas on which examination is requested,” including specifically “[t]he care and treatment rendered by Patricia Yugueros, M.D., to Iselda Moreno.”
Artisan designated Diane Z. Alexander, M.D., as its representative to respond to the topics identified in Robles’ notice of deposition. Dr. Alexander is the president of Artisan’s board and owns half of the practice. At the deposition, Robles asked Dr. Alexander to recount her recollection of what she had been told about Dr. Yugueros’ care of Moreno, and Dr. Alexander related the events as she understood them, beginning with Moreno’s first two calls to Dr. Yugueros regarding her post-surgical pain. Dr. Alexander recalled that Moreno had gone to the GMC emergency room and had been discharged, called again with complaints of pain, and then went to Northside Hospital’s emergency room, where Dr. Yugueros admitted her for observation. After Moreno’s pain was controlled, Dr. Yugueros went home, but Moreno was then admitted to the intensive care unit and began to decompensate. Dr. Yugueros returned to the hospital and called general surgery, Moreno was put on the schedule, her surgery was delayed but she was finally brought to the operating room, and she passed away within hours.
Dr. Alexander concluded her recitation of Moreno’s post-op treatment and care by saying, “I believe somewhere in there she had a CT scan as well,” and the following exchange took place:
Q. Do you know who ordered a CT scan?
A. I suspect Dr. Yugueros ordered it.
*328 Q. Would that, given your understanding, have been part of the standard of care to order a CT scan?
[Objection to form.]
A. If you don’t understand why the patient — why they’re having pain, it would be standard of care to — if you don’t know what’s going on, that would be a — yes. The answer is, yes, a CT scan would be — it would provide more information. And then the other piece of information that I remember were [sic] that she had the x-ray at the other hospital which showed free air and that that had not been communicated to Dr. Yugueros or — and the emergency room at Northside was also not made aware of that as well. So that’s my recollection and that’s just what Dr. Ashraftoldme about the case.
In response to a notice to produce, Dr. Alexander brought to the deposition and identified Moreno’s medical records that Artisan had maintained.
The trial court granted Artisan’s motion in limine to exclude this testimony, finding that it was based on hearsay, that Dr. Alexander’s opinion was not based on all the data necessary to form an opinion, that Robles did not ask whether Dr. Alexander could say to a degree of medical certainty that Dr. Yugueros violated the standard of care, and that the testimony was ambiguous and could mean that “the CAT scan is part of what might be considered as part of the standard of care to be considered.” But the issue is not whether Dr. Alexander’s testimony was admissible as an expert opinion under OCGA § 24-7-702 (b). Under OCGA § 9-11-32 (a) (2), the properly-noticed deposition of an OCGA § 9-11-30 (b) (6) witness is admissible against a party who was represented at the deposition, subject to the rules of evidence.
The defendant-appellees argue that a trial court’s decision about whether a witness is qualified to render an expert opinion should be reviewed for abuse of discretion only, and contend that Dr. Alexander was not qualified as an expert and that her opinion was not buttressed by sufficient facts or data to be admissible. But this argument misses the mark entirely. The evidence was not offered as expert testimony under OCGA § 24-7-702 (b); it was offered as a party’s admission against interest under OCGA § 9-11-32 (a) (2). Further, the fact that Dr. Alexander’s admission was prefaced by the erroneous belief that Dr. Yugueros had ordered a CT scan when no one actually ever ordered one only adds to the import of her admission. She assumed that Dr. Yugueros had ordered a CT scan because, according to Dr. Alexander’s subsequent explanation, the standard of care would be for the doctor to order a scan and obtain more information *329 if she did not understand “what’s going on” or why the patient was having pain. Her testimony about standard of care was not based on whether or not Dr. Yugueros actually ordered a CT scan, but was simply an explanation of why a doctor should have done so.
The dissent would find harmless any error in this evidentiary ruling because the plaintiff presented expert testimony that the standard of care was to have ordered a CT scan, and because Robles could have called Dr. Alexander as a live witness and asked “similar non-objectionable questions.” But the testimony of an expert witness, or even two expert witnesses, is not comparable to a party’s admission against interest. And the fact that Robles could have called Dr. Alexander as a live witness is irrelevant, because he was entitled under OCGA § 9-11-32 (a) (2) to introduce the deposition testimony into evidence.
The trial court’s error in failing to allow Robles to introduce Artisan’s admission against interest was not harmless and necessitates a new trial.
Because the case must be retried, we do not reach the remaining enumerations of error.

Judgment reversed and case remanded with direction.

Doyle, C. J., Phipps, P. J., Boggs and McMillian, JJ., concur. Andrews, P. J., and Ray, J., dissent.