**WHOLE COURT**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**October 26, 2017**

# In the Court of Appeals of Georgia

A15A1566. ROBLES et al. v. YUGUEROS et al.

BARNES, Presiding Judge.

In *Yugueros v. Robles*, 300 Ga. 58 (793 SE2d 42) (2016), the Supreme Court of Georgia reversed our decision in *Robles v. Yugueros*, 335 Ga. App. 324 (779 SE2d 139) (2015), then remanded the case to this Court for proceedings consistent with its opinion. *Yugueros*, 300 Ga. at 67. We thus vacate our earlier decision, and for reasons discussed below, we affirm.

As set forth by the Supreme Court, this case arose from the following facts.

Iselda Moreno, wife of Rudy Robles, received liposuction, buttock augmentation, and abdominoplasty surgery performed by Dr. Patricia Yugueros of Artisan Plastic Surgery, LLC ("[medical practice group]") on June 24, 2009. Suffering abdominal pain, Moreno went to the emergency room at Gwinnett Medical Center ("GMC"), where Dr. Michael Violette ultimately discharged her after determining her abdominal x-ray was unremarkable. A GMC radiologist, Dr. James York, who later saw Moreno's abdominal x-ray, could not rule out the possibility of "free air" in her abdomen, which could be a normal post-operative condition or could indicate a more serious issue. He

recommended a CT scan and posted this opinion in Moreno's electronic medical record.

Moreno's pain worsened and Robles contacted Dr. Yugueros on Moreno's behalf, who directed him to take Moreno to Northside Hospital, where Dr. Yugueros had privileges; there, Dr. Yugueros provided certain treatment, but did not order a CT scan or procure the radiology report from GMC. Dr. Yugueros, in concert with various other medical professionals, ordered other tests, including an abdominal x-ray, which showed evidence of abdominal free air. Several hours later, on June 28, 2009, Moreno died.

*Yugueros*, 300 Ga. at 58.

Robles, individually, as Moreno's surviving spouse, and as administrator of Moreno's estate, sued Dr. Yugueros and the medical practice group. He alleged that his wife had died of abdominal compartment syndrome, caused by abdominal free air that had resulted from a perforated stomach. Robles claimed that Dr. Yugueros had committed medical malpractice – not during the surgery, but thereafter – by failing to recognize clinical evidence of his wife's post-operative complications that arose and caused her death.[1] Robles sought to hold the medical practice group vicariously liable.

---

[1] As Robles's counsel would later demarcate at a pretrial hearing, "The allegations of negligence as against Dr. Yugueros relate[ ] solely to how she handled

Dr. Yugueros and the medical practice group denied liability; further, they designated Drs. Violette and York, as well as GMC, as nonparties at fault.

The case proceeded to trial in November 2014. The jury returned a defense verdict, and judgment was entered thereon. Robles appealed to this Court, contesting various evidentiary rulings, curtailment of his closing argument, and the placement of nonparties on the verdict form for purposes of apportionment.

When this case was initially before us, *Robles*, 335 Ga. App. at 324, this Court found as reversible error the trial court's exclusion of certain deposition testimony given by the medical practice group's designated OCGA § 9-11-30 (b) (6) witness. In light of the Supreme Court's reversal based on that issue, see *Yugueros*, 300 Ga. at 67, we resume our review of this case.

1. First, we revisit Robles's contention that the trial court erred by excluding certain testimony given by the OCGA § 9-11-30 (b) (6) witness, Dr. Diane Z. Alexander, a physician, founder, and co-owner of the medical practice group. Pertinent here, she deposed that when Dr. Yugueros was told about Robles's wife's ongoing,

the post-operative complications that developed on the 27th and 28th."

3

post-surgical abdominal pain, the standard of care required the physician to employ a CT scan to ascertain the underlying cause.[2] As noted above, however, Dr. Yugueros neither ordered a CT scan, nor procured the radiology report from GMC.

Dr. Yugueros and the medical practice group moved to exclude the cited deposition testimony. At a pretrial hearing conducted in January 2014, their counsel argued that Robles had failed to establish that the deponent's standard-of-care opinion was "based upon sufficient facts or data" as required by OCGA § 24-7-702 (b),[3] which is applicable when determining the admissibility of expert testimony.[4]

---

[2] Dr. Alexander's exact testimony is provided at *Yugueros*, 300 Ga. at 62.

[3] OCGA § 24-7-702 (b) (1) ("If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise, if . . . *[t]he testimony is based upon sufficient facts or data*.") (emphasis supplied).

[4] Specifically, they cited that Dr. Alexander had never been identified as an expert; they asserted that she had never reviewed the medical records, had never been privy to any of the information that Dr. Yugueros had at the time, and had not conducted any meaningful analysis of the standard of care or of "the causation question." As they posited, Dr. Alexander had been proffered "as a fact witness only. It was only given for that purpose and . . . we don't intend to identify her or use her or attempt to use her as an expert in the case." Counsel for the medical practice group added, "[Dr. Alexander is] going to be available for trial only to the extent of possibly these agency issues and business-related issues with the – someone has got to be here for the practice and that's going to be her. . . ."

In response, Robles's counsel made no assertion that the statutory provision was met. Counsel instead took the position,

> [We] raised in our 30 (b) (6) notice [that] [the medical practice group] provide someone that can give testimony about the care and treatment rendered by Patricia Yugueros M.D. to [Robles's wife]. So, whether Dr. Alexander took to that seriously, whether she did enough preparation, that's her risk. [The medical practice group] is bound by the designee that they put to testify on their behalf. That's black letter law. . . . I can understand why they don't want that to come in but she is bound by the fact she's designated as a 30 (B) (6) witness. . . . That's not my problem in terms of admissibility.

After additional argument on behalf of the parties – including a proposal by counsel for Dr. Yugueros that Dr. Alexander be allowed to "review the medical records and be able to respond to . . . questions," the trial court ruled that the cited deposition testimony would be excluded, but that such ruling was "without prejudice to raising [the issue]" at trial. As the court explained, Robles could seek to introduce Dr. Alexander's medical opinion at trial, based upon "what the actual evidence is" at that time. But at trial, Robles's counsel merely reasserted his previous argument, and the deposition testimony was not presented to the jury.

5

When this case was initially before us, this Court determined that the exclusion of the deponent's medical opinion was reversible error. *Robles*, 335 Ga. App. at 325. We pointed out that the evidence was *not offered* as expert testimony under OCGA § 24-7-702 (b); noted that Robles sought to introduce the testimony as a party's admission against interest under OCGA § 9-11-32 (a) (2); and recited that such statutory paragraph provided for a properly-noticed deposition of an OCGA § 9-11-30 (b) (6) witness to be admitted against a party who was represented at the deposition, subject to the rules of evidence. *Robles*, 335 Ga. App. at 328. Thereupon, this Court concluded, "[Robles] was entitled under OCGA § 9-11-32 (a) (2) to introduce the deposition testimony into evidence." *Robles*, 335 Ga. App. at 329.

The Supreme Court granted certiorari to determine,

whether [the Court of Appeals] was correct in holding that deposition testimony of an organizational representative taken under OCGA § 9-11-30 (b) (6) may be admitted into evidence at trial under OCGA § 9-11-32 (a) (2), without regard to the rules of evidence governing admissibility of expert testimony, see OCGA § 24-7-702.

*Yugueros*, 300 Ga. at 58. After examining the interplay among several Code sections, the Supreme Court held,

6

OCGA § 9-11-32 (a) (2) . . . does not create a rule of evidence that allows any deposition taken under OCGA § 9-11-30 (b) (6) to be admitted at trial in its entirety as "an admission against interest," but provides for the admission of the deposition when that admission is permitted under relevant rules of evidence. And, when testifying as to the medical standard of care, OCGA § 24-7-702 is a relevant rule of evidence[.]

(Footnote omitted.) *Yugueros*, 300 Ga. at 67.

In light of that holding, we conclude that Robles has failed to demonstrate reversible error. As the proponent of the expert testimony, Robles had the duty to show its admissibility. *HNTB Ga. v. Hamilton-King*, 287 Ga. 641, 646 (2) (697 SE2d 770) (2010) ("[R]egardless of an expert's experience or qualifications, the proffering party bears the burden of presenting evidence of reliability in order to met the standards of [OCGA § 24-7-702]."); accord *United States v. Frazier*, 387 F3d 1244, 1260 (III) (A) (11th Cir. 2004) (reiterating that the proponent of the expert opinion has the burden of showing its admissibility).[5] Yet, Robles made no claim to the trial court that Dr. Alexander's medical opinion met the cited requirement of OCGA § 24-7-702 (b), choosing instead to seek admission of the evidence solely on the ground that it was

---

[5] See generally OCGA § 24-7-702 (f).

7

obtained during the deposition of the medical practice group's OCGA § 9-11-30 (b) (6) witness. But as the Supreme Court has since clarified, the trial court's role of gatekeeper under OCGA § 24-7-702 "is not extinguished simply because deposition testimony, including expert testimony, is secured under OCGA § 9-11-30 (b) (6)." *Yugueros*, 300 Ga. at 67.

In his opening brief to this Court, Robles asserts that "Dr. Alexander is an experienced plastic surgeon," that "[she] satisfied both prongs of OCGA § 24-7-702 *(c)*," that any lack of personal knowledge about the underlying events and Robles's wife's medical record "does not impact Dr. Alexander's *qualifications*," and that "[he (Robles)] should not be penalized *because Dr. Alexander was insufficiently prepared*."[6] These conclusory assertions, however, do not respond to the specific challenge raised under OCGA § 24-7-702 *(b)*. See generally *HNTB Ga.*, 287 Ga. at 646 (2) (concerning proffering party's burden in the trial court); *Dixon v. MARTA,* 242 Ga. App. 262, 266

---

[6] (Emphasis supplied.) In his reply brief, Robles reaffirms his position, "This testimony was provided not in Dr. Alexander's individual capacity but in her capacity as a Rule 30 (b) (6) designee. As a result, the question of the admissibility of her testimony does not arise in the context of testimony obtained from an individual or from a hired expert."

8

(4) (529 SE2d 398) (2000) (reiterating that legal analysis requires "at a minimum, a discussion of the appropriate law as applied to the relevant facts"). Moreover, Robles has made no effort to cite this Court to any evidence that the trial court failed to consider in deciding the issue of admissibility. And this Court has no duty to "cull the record – in this case [35] volumes – on an appellant's behalf" to support a position *not* advanced below. *Carlisle v. Abend*, 288 Ga. App. 150, 151 (1) (653 SE2d 388) (2007); see *Burrell v. State*, 301 Ga. 21, 26 (3) (799 SE2d 181) (2017) (refusing to reach merits of evidentiary issue because "[i]t is not this Court's job to cull the record on behalf of Appellant to find alleged errors"); *Lowery v. Atlanta Heart Assoc*., 266 Ga. App. 402, 405 (2) (597 SE2d 494) (2004) (deciding that the appellant, "[h]aving taken [one] position throughout the entire course of this litigation [concerning expert testimony], cannot raise the contrary argument for the first time on appeal"); see generally *Pfeiffer v. Ga. Dept. of Transp.*, 275 Ga. 827, 829 (2) (573 SE2d 389) (2002) (reiterating principles that "[a litigant] must stand or fall upon the position taken in the trial court" and that "[f]airness to the trial court and to the parties demands that legal issues be asserted in the trial court") (citation and punctuation omitted); *Mays v. Ellis*, 283 Ga. App. 195, 199 (2) (641 SE2d 201) (2007) (finding waiver of whether expert testimony

was admissible under expert witness statute, where party failed to properly preserve issue); *Cherokee Nat. Life Ins. Co. v. Eason*, 276 Ga. App. 183, 187 (2) (622 SE2d 883) (2005) (reciting principle that a party cannot "complain of an error which its own conduct procured or aided in causing").

For all these reasons, Robles has failed to carry his burden as appellant to show an abuse of discretion by the trial court.[7] Consequently, this contention provides no basis to disturb the judgment.

2. Robles's remaining challenges to the judgment – which we did not reach when this case was initially before us[8] – relate to the alleged fault of nonparties and other matters of apportionment.

---

[7] See *HNTB Ga.*, 287 Ga. at 642 (1) (trial court's determination whether witness is qualified to render opinion as expert will not be disturbed "absent a manifest abuse of discretion") (citation and punctuation omitted); *Meacham v. Franklin-Heard County Water Auth.*, 302 Ga. App. 69, 76 (3) (690 SE2d 186) (2009) ("The issue of the admissibility or exclusion of expert testimony rests in the broad discretion of the trial court, and, consequently, the trial court's ruling thereon cannot be reversed absent an abuse of discretion.") (citation and punctuation omitted).

[8] See *Robles*, 335 Ga. App. at 329 ("Because the case must be retried, we do not reach the remaining enumerations of error.").

As noted above, the defendants designated three nonparties as having fault in this case: (i) GMC, which operated the emergency room facility where Robles's wife sought relief from her pain on June 27, three days after her surgery; (ii) Dr. Violette, the emergency medicine physician at GMC's emergency room who ordered an abdominal x-ray of Robles's wife's kidney, ureter and bladder ("KUB"), which he interpreted as unremarkable, then prescribed her pain medications and discharged her; and (iii) Dr. York, the radiologist who later reviewed the same KUB at GMC, identified a suspicion of abdominal free air, posted in Robles's wife's electronic medical record his recommendation for a CT scan, but did not otherwise communicate his findings and recommendation to Dr. Violette (or to Dr. Yugueros). According to Dr. York, GMC's policies and procedures had not required him to do so.

At trial, to evince their position that these three nonparties bore fault, the defendants presented the expert testimony of Dr. Henry J. Krebs, a radiologist, who stated that Robles's wife's KUB was *not* unremarkable. Focusing on "a number of findings that kind of jump out at you," Dr. Krebs pointed out that Robles's wife's stomach was "massively distended, probably four or five time what a normal stomach should look like," that her transverse colon was severely displaced, and that her bowel

11

gas pattern was "very abnormal." These collective circumstances, Dr. Krebs testified, revealed an 85 to 90 percent probability that free air existed in Robles's wife's abdomen – a condition that Dr. Krebs described as a "critical result," an "absolutely. . . emergency type of thing" that required immediate evaluation by a CT scan. As Dr. Krebs explained, a CT scan would have confirmed whether the suspicious area was "free air or not."

Dr. Krebs opined that, given what Robles's wife's KUB revealed, Dr. Violette had breached the standard of care by, inter alia, misinterpreting Robles's wife's KUB as unremarkable. Additionally, Dr. Krebs opined that GMC had breached the standard of care, citing deficiencies in the reporting and communication processes, and further asserting that GMC's policies and procedures should have required that abnormal findings be communicated immediately and directly to treating physicians. (While Dr. Krebs went on to render medical opinions as to Dr. York, those opinions are not at issue in this appeal.)

In several overlapping claims of error, Robles complains about the admission of Dr. Krebs's testimony as follows.

12

(a) Robles contends that the trial court erred by denying his pre-trial motions to exclude Dr. Krebs's medical opinions about the emergency medicine physician at GMC, Dr. Violette. Robles argues that because Dr. Krebs was a radiologist who had never practiced emergency medicine, he was not qualified under OCGA § 24-7-702 (c) to give expert testimony about the care and treatment rendered by Dr. Violette.

OCGA § 24-7-702 (c) pertinently provides,

[T]he opinions of an expert, who is otherwise qualified as to the acceptable standard of conduct of the professional whose conduct is at issue, shall be admissible only if, at the time the act or omission is alleged to have occurred, such expert . . . had *actual professional knowledge and experience in the area of practice or specialty in which the opinion is to be given* as the result of having been regularly engaged in. . . [t]he active practice of such area of specialty of his or her profession for at least three of the last five years, with sufficient frequency to establish *an appropriate level of knowledge*, as determined by the judge, in performing the procedure, diagnosing the condition, or rendering the treatment which is alleged to have been performed or rendered negligently by the defendant whose conduct is at issue. . . .

(Emphasis supplied.) OCGA § 24-7-702 (c) (2) (A). Interpreting that language, the Georgia Supreme Court has explained,

[T]he requirement that the expert have "actual professional knowledge and experience in the area of practice or specialty in which the opinion is to be given" means that the . . . expert does *not* have to have knowledge and experience in the *same area of practice/specialty as the defendant doctor*. Instead, under the foregoing language, the issue is whether the expert has knowledge and experience in the practice or specialty that is relevant to the acts or omissions that . . . allege[dly] constitute[d] malpractice and caused the plaintiff's injuries. However, it is not sufficient that the expert have just a minimum level of knowledge in the area in which the opinion is to be given. Instead, the expert must have "regularly engaged in the active practice" of the area of specialty "in which the opinion is to be given" and must have done so "with sufficient frequency to establish an appropriate level of knowledge . . . in performing the procedure, diagnosing the condition, or rendering the treatment which is alleged to have been performed or rendered negligently by the defendant whose conduct is at issue."

(Citation and punctuation omitted; emphasis omitted and supplied.) *Nathans v. Diamond*, 282 Ga. 804, 806 (1) (654 SE2d 121) (2007);[9] see *Bonds v. Nesbitt*, 322 Ga. App. 852, 857 (3) (757 SE2d 40) (2013) (same).[10] Broadly speaking, "Rule 702 is

---

[9] In *Nathans*, the Court was reviewing OCGA § 24-6-67.1 (c) (2) (A), but the statutory language does not differ from that set forth in OCGA § 24-7-702 (c) (2) (A).

[10] In *Bonds*, 322 Ga. App. at 857 (3), this Court noted that OCGA § 24-7-67.1 (c) was replaced with OCGA §24-7-702 (c).

designed to ensure that an expert genuinely knows of that of which he speaks." *Dubois v. Brantley*, 297 Ga. 575, 586 (2) (775 SE2d 512) (2015). "No doubt, the simplest way to demonstrate that an expert has an appropriate level of knowledge in performing a procedure[, diagnosing the condition, or rendering the treatment] . . . is by proof that the expert actually has done these things himself." (Punctuation omitted.) Id. at 585 (2).

During his deposition, Dr. Krebs stated that he had been practicing radiology for nearly three decades. During those years, he had read many images ordered by emergency medicine physicians. Routinely, the emergency medicine physicians would first interpret images such as a KUB and other abdominal x-rays; and thereafter, those same images/studies were read and reduced to a written report by him as the radiologist. Dr. Krebs recounted, "I have worked in many emergency rooms alongside emergency room physicians for many, many years. So I have many, many emergency room physicians that I know very well and how they practice." In some of his previous working environments, Dr. Krebs recalled, he was "physically located" in the emergency medicine department.

Given Dr. Krebs's medical background and experience, which included reading the exact type of x-ray at issue here – and doing so in collaboration with emergency

15

medicine physicians, the trial court did not abuse its discretion in rejecting Robles's contention that, because Dr. Krebs was a radiologist who had never practiced emergency medicine, he was not qualified under OCGA § 24-7-702 (c) to render opinions regarding Dr. Violette's interpretation of Robles's wife's KUB.[11] See *Dubois*, 297 Ga. at 587 (2) ("[A]n expert has an "appropriate level of knowledge . . . in performing the procedure" to the extent that the expert has sufficient knowledge about the performance of the procedure — however generally or specifically it is characterized, so long as it is the procedure that the defendant is alleged to have performed negligently — to reliably give the opinions about the performance of the procedure that the expert proposes to give."); *Mays*, 283 Ga. App. at 196-199 (1) (concluding that gastroenterologist was qualified to render opinion that OB/GYN – who performed surgery on patient based on OB/GYN's diagnosis that patient was suffering from pancreatitis – had committed negligence by misdiagnosing patient's

---

[11] See *Dubois*, 297 Ga. at 587 (2) ("Whether the experience of a particular expert witness is enough to establish that the expert has an 'appropriate level of knowledge' is a question committed to the discretion of the trial court."); *Nathans*, 282 Ga. at 806 (1), n. 8 (reciting that a trial court's determination on the qualifications of an expert witness will not be reversed absent a clear abuse of discretion).

pancreatitis; and that if timely diagnosed, patient's condition could have been treated nonsurgically). Accord *McDowell v. Brown*, 392 F3d 1283, 1297 (III) (11th Cir. 2004) ("The proffered physician need not be a specialist in the particular medical discipline to render expert testimony relating to that discipline.") (citation and punctuation omitted); *Mitchell v. United States*, 141 F3d 8, 12-16 (I) (C) (1st Cir. 1998) (explaining that although the putative expert must be "qualified by knowledge, skill, experience, training, or education," proffered expert physician need not be a specialist in a particular medical discipline to render expert testimony relating to that discipline); *Holbrook v. Lykes Bros. S.S. Co.*, 80 F3d 777, 782 (I) (B) (3d Cir. 1996) ("[T]he district court erred by finding that [internist] was not qualified to render a diagnosis or to discuss the pathology report because he was not a pathologist, oncologist or expert in 'definitive cancer diagnosis.'").

(b) Another ground upon which Robles sought to exclude Dr. Krebs's medical opinions about Dr. Violette was premised upon certain statements made by Dr. Krebs during his deposition that "I'm not an ER physician so I'm not really qualified to talk about any of his standard of care treating the patient," and "[a]gain, I can't speak to standard of care for an ER physician." Robles urged below that Dr. Krebs was

consequently unqualified under OCGA § 24-7-702 (c) to opine about the standard of care. In making this argument, Robles cited further subsection (c) of Georgia's ER statute, OCGA § 51-1-29.5.[12]

But when the flagged statements are viewed in the context of Dr. Krebs's entire deposition, it is readily apparent that Dr. Krebs was *not* referring to the specific (alleged) negligence that the defense sought to attribute to Dr. Violette. While Dr. Krebs repeatedly explained that his opinions would not encompass each and every aspect of Dr. Violette's practice of emergency medicine, Dr. Krebs maintained, "What I am prepared to discuss is when [Dr. Violette] interprets radiographs that does cross between what my area of expertise is." The flagged statements, hence, did not render Dr. Krebs unqualified under OCGA § 24-7-702 (c).

In relevant part here, OCGA § 24-7-702 (c) provides for the admission of the opinions of an expert "who is otherwise qualified as to the acceptable standard of

---

[12] OCGA § 51-1-29.5 (c) ("In an action involving a health care liability claim arising out of the provision of emergency medical care in a hospital emergency department or obstetrical unit or in a surgical suite immediately following the evaluation or treatment of a patient in a hospital emergency department, no physician or health care provider shall be held liable unless it is proven by clear and convincing evidence that the physician or health care provider's actions showed *gross negligence*.") (emphasis supplied).

18

conduct of the professional whose conduct is at issue."[13] That language contemplates that the expert is "generally familiar with the standard of conduct of the medical professional in question." *Nathans*, 282 Ga. at 804, 807 (1). In light of Dr. Krebs's medical background and experience, the trial court was authorized to conclude that Dr. Krebs was qualified to give expert testimony about the accepted standard of *medical* care applicable to a physician interpreting the type of x-ray at issue here and to render an opinion whether Dr. Violette's interpretation of Robles's wife's KUB breached that standard of care.[14]

Although Robles relies further on the ER statute, nothing therein purports to change the accepted standard of care for any medical professional. See *Johnson v. Omondi*, 294 Ga. 74, 81 (1) (751 SE2d 288) (2013) ("By its enactment of OCGA § 51-1-29.5, the General Assembly did not divorce the generally accepted standards of medical care from the cases to which the statute applies.") (Blackwell, Justice, concurring specially, joined by Justice Nahmias). Rather, by enacting that statute, "the

---

[13] See further OCGA § 24-7-702 (b) (denoting "a witness qualified as an expert *by knowledge, skill, experience, training, or education*") (emphasis supplied).

[14] See Division 2 (a), supra.

19

General Assembly . . . placed a higher evidentiary burden on [parties alleging certain medical malpractice to show] that any departure from accepted standards of medical care must be shown, by clear and convincing evidence, to be gross negligence." *Johnson*, 294 Ga. at 74.[15] Thus, a party may present expert testimony that a physician's actions violated the accepted standard of medical care, and the jury may consider such expert testimony, along with other evidence presented, in deciding whether there was gross negligence. See, e.g., *Johnson*, 294 Ga. at 78-79 (discussing evidence that plaintiff presented that created a jury issue over gross negligence, which evidence included expert testimony that the physician's actions "did not meet the standard of care in the medical profession generally under like and similar circumstances"). Hence,

---

[15] "Indeed, OCGA § 51-1-29.5 itself makes this point quite plainly, insofar as it applies only with respect to 'health care liability claim[s],' OCGA § 51-1-29.5 (c), and it expressly defines a 'health care liability claim' as 'a cause of action against a health care provider or physician for treatment, lack of treatment, or *other claimed departure from accepted standards of medical care . . . .*'" *Johnson*, 294 Ga. at 81 (1) (Blackwell, Justice, concurring specially, joined by Justice Nahmias). Additionally, "other jurisdictions have recognized [that] [t]he medical standard of care is the same for ordinary negligence and gross negligence, the difference being the extent to which the physician breached the standard. To be grossly negligent, the defendant must breach the ordinary standard of care to a greater degree." (Citations and punctuation omitted.) *Johnson*, 294 Ga. at 83 (1) (Blackwell, Justice, concurring specially, joined by Justice Nahmias).

20

contrary to Robles's contention, the cited provision of the ER statute, together with the flagged deposition statements made by Dr. Krebs, did not mandate the trial court to conclude that Dr. Krebs was unqualified under OCGA § 24-7-702 (c) to give expert testimony with respect to the accepted standard of medical care that applied to Dr. Violette's interpretation of Robles's wife's KUB.[16] Nothing in *Bonds*, 322 Ga. App. at 858 (3) – which Robles cites for the general principle that "an expert must be . . . familiar with the standard of care" – required an evidentiary ruling in his favor.

For all these reasons, this contention shows no abuse of discretion in the trial court's denial of Robles's pretrial motions to exclude Dr. Krebs's medical opinions.

(c) Robles contends that the trial court erred in denying his pretrial motions to preclude Dr. Krebs from giving expert testimony on whether GMC had been negligent with respect to its policies and procedures that pertained to how radiologists' findings were communicated to treating physicians.

---

[16] "[T]he heightened evidentiary burden imposed in cases falling under OCGA § 51-1-29.5 (c) must necessarily be considered [if raised, for instance] on a motion for summary judgment. [And when] faced with such a heightened burden, a trial judge must bear in mind the actual quantum and quality of proof necessary to support liability." *Johnson*, 294 Ga. at 77. At issue here, however, was whether the proffered expert (Dr. Krebs) was qualified under OCGA § 24-7-702 (c) to opine about the standard of *medical* care.

(i) Robles maintains that Dr. Krebs was not qualified under OCGA § 24-7-702 (c) to give the aforementioned opinions about GMC, asserting that the radiologist had never developed any such policies or procedures for a hospital. Pretermitting whether expert testimony was required,[17] we find no abuse of discretion, given Dr. Krebs's background and experience, as previously discussed.[18]

(ii) Robles contends that the trial court erred by allowing Dr. Krebs to testify about GMC's policies and procedures, asserting that the defense failed to supplement their discovery responses to reflect their intent to present such evidence during the trial. This contention is unavailing.

The record shows that Robles's counsel appeared at Dr. York's deposition, during which Dr. York detailed GMC's policies and procedures in explaining why his own findings of suspected free air, together with a recommendation for a CT scan, had

---

[17] Robles relied upon *Cowart v. Widener*, 287 Ga. 622 (697 SE2d 779) (2010), for the general principle, that while expert evidence is not typically required to prove causation in a simple negligence case, "expert evidence is required where a 'medical question' involving truly specialized medical knowledge (rather than the sort of medical knowledge that is within common understanding and experience) is needed to establish a causal link between the defendant's conduct and the plaintiff's injury." (Emphasis omitted.) Id.

[18] See Division 2 (a).

not been communicated immediately/directly to any physician. Additionally, the pretrial order entered in this case, which Robles's counsel signed, identified GMC's policies/procedures as possible trial exhibits. And at a subsequent pretrial hearing on the parties' motions to exclude the testimony of proffered experts (including Dr. Krebs), Robles's counsel reported to the trial court, "I have got the policies and procedures if you would like them. They are in the record."

This contention presents no basis to disturb the judgment entered by the trial court.

3. Robles contends that the trial court erred by allowing the defense to place Dr. Violette and GMC on the verdict form (for purposes of apportionment). Robles maintains that there was no competent evidence that these nonparties were at fault for the injuries alleged in this case.

This contention hinges on Robles's arguments that Dr. Krebs was not qualified to render expert testimony, which arguments lack merit.[19] Moreover, the jury found for

---

[19] See Division 2, supra.

the defendants as to liability, and thus did not reach the apportionment issues set forth on the verdict form.[20] This contention shows no reversible error.[21]

4. Robles contends that the trial court erred by instructing the jury, sua sponte, to disregard a certain portion of Dr. Krebs's testimony.

When Robles's counsel was cross-examining Dr. Krebs, the following exchange occurred:

Q:     Now you would agree with me, Dr. Krebs, that it was not gross negligence for Dr. Violette to not appreciate the possibility of free air –

[Counsel for Dr. Yugueros]: Objection.

Q:     – on the KUB?

_____

[20] Part I of the verdict form allowed the jury to find for either the plaintiff or the defendants, and instructed the jury that if it found for the defendants, it should stop there and sign and return the verdict. If it found for Robles, the jury was instructed to continue to Part II regarding the damages award and the apportionment of fault among the defendants and nonparties listed on the verdict form.

[21] See generally *U. S. Indus. v. Austin*, 197 Ga App. 74, 75 (2) (397 SE2d 469) (1990) (explaining that errors in "the giving of a charge or [in] the admission or exclusion of evidence, which go only to the matters of damages or the measure of damages, are harmless and afford no ground for reversal where a verdict was returned in favor of the defendant") (citations and punctuation omitted); *Johnson v. Amerson*, 179 Ga. App. 75, 76 (2) (345 SE2d 94) (1986) (same).

24

A:     I don't think so.

[Counsel for Dr. Yugueros]: This is calling for a legal conclusion.

The Court:   I'm going to overrule the objection.

A:     I think it does borderline gross negligence not to see that.

Later, just before re-direct examination began, the trial court gave the sua sponte instruction that Robles now contests:

There was an objection previously about the doctor testifying to a legal standard and I made the wrong call on that one. That is that should not – he is not qualified to testify as to a legal standard. He's qualified to testify to the standard of care . . . a physician should utilize in an area relevant to whatever his testimony is but he is not entitled to testify about the legal standard. The court will provide you with the law at the end of the case and then you will apply the fact[s] as you find them to be to the law that the court will provide. So I want to instruct you to disregard that testimony and do not consider it in any way in your deliberations with regards to the doctor's comments on the legal standard required of a[n] emergency room physician.

Pretermitting whether Robles's counsel waived the issue by neither countering the objection when lodged, nor objecting to the court's sua sponte ruling/instruction, we find no reversible error. Questions of gross negligence are usually for the facfinder.

25

*Johnson*, 294 Ga. at 78. Here, the cited ruling/instruction essentially struck from the jury's consideration Dr. Krebs's explicit opinion that Dr. Violette's misinterpretation of the KUB constituted "borderline gross negligence." Robles has provided no explanation of how he was prejudiced by the *striking* of evidence that a nonparty (someone other than the named defendants) was at fault; consequently, this contention falls short of providing a basis to disturb the judgment.

5. Robles contends that the trial court erred by truncating that part of his closing argument that would have explained the monetary effects of apportionment.

During closing arguments, Robles's attorney said to the jury, "But when you go back and talk about apportionment understand this: The Court is gonna instruct you that anything you assign to these nonparties – we didn't sue them –." Opposing counsel cut short this passage with an objection. Outside the jury's presence, defense counsel argued that it was improper to tell the jury that nonparties are not responsible to pay any portion of a damages award. Agreeing, the trial court sustained the objection.

Robles complains of that ruling on appeal, but has shown no error. Georgia's apportionment statute, OCGA § 51-12-33, "directs the trier of fact in certain cases to 'consider the fault of all persons or entities who contributed to the alleged injury or

26

damages' . . . regardless of whether such tortfeasor would have *actual liability* in tort to the plaintiff." (Citation and punctuation omitted; emphasis supplied.) *Walker v. Tensor Machinery*, 298 Ga. 297, 297 (779 SE2d 651) (2015), quoting OCGA § 51-12-33 (c); *Zaldivar v. Prickett*, 297 Ga. 589, 600 (1) (774 SE2d 688) (2015) (same). Because it was unnecessary for the jury to consider that the nonparties would have no responsibility to pay any damages awarded, the trial court did not err in curtailing the cited portion of the closing argument. See *Cotton v. Cotton*, 272 Ga. 276, 278 (3) (528 SE2d 255) (2000) ("[A] trial court is authorized to require counsel to eliminate from argument a reference to matters which are unnecessary for the jury to consider."). Robles has demonstrated no basis for disturbing the judgment.

*Judgment affirmed. Ray, P.J., Andrews, Doyle, McMillian, Reese, Self, JJ., concur.*