**SECOND DIVISION**
**RICKMAN, C. J.,**
**MILLER, P. J., and PIPKIN, J.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**February 24, 2023**

# In the Court of Appeals of Georgia

A22A1289, A22A1290. ZEH et al. v. MASO et al.; and vice versa.

RICKMAN, Chief Judge.

This appeal and cross-appeal arise from a medical malpractice action filed by Carole Maso, individually as surviving spouse and as executrix of the Estate of Eugene Charles Maso (collectively, "Maso"). In Case No. A22A1289, defendants Brian Zeh, M.D., Stephen Hammond, and Northside Anesthesiology Consultants, LLC, (collectively the "Northside defendants") appeal from the trial court's order denying Dr. Zeh's motion for summary judgment. The Northside defendants contend that the trial court erred by finding that the Physician Assistant Act ("PAA"), OCGA § 43-34-100 et seq., creates vicarious liability for physicians for the conduct of physician assistants they supervise. In Case No. A22A1290, Maso cross-appeals from the trial court's order denying her motions to exclude testimony of two defense expert

witnesses, arguing that the testimony of both witnesses should be excluded under OCGA § 24-7-702. For the reasons explained below, we reverse in Case No. A22A1289, and we affirm in part and reverse in part in Case No. A22A1290.

Maso's complaint, as amended, alleged that her husband, Dr. Eugene Maso, underwent an elective outpatient endoscopic retrograde cholangiopancreatography ("ERCP") procedure on June 18, 2018. The anesthesia staff for Dr. Maso's procedure included Dr. Zeh, an anesthesiologist, and Hammond, a physician assistant ("PA"). According to Maso, her husband died as a result of inadequate respiratory and ventilatory monitoring by Hammond.

Maso sued Hammond, Dr. Zeh, and their employer, Northside Anesthesiology Consultants, LLC, for medical malpractice claims arising from the medical treatment provided to her husband. Maso subsequently filed motions to exclude testimony from two defense experts, which the trial court denied.

Dr. Zeh filed a motion to exclude vicarious liability testimony and for summary judgment. The trial court denied Dr. Zeh's motion, noting that because Maso had voluntarily withdrawn her direct liability claims against Dr. Zeh and agreed that her experts would not offer testimony regarding whether Georgia law provides a basis for the imposition of vicarious liability against Dr. Zeh, the only remaining issue raised

2

by Dr. Zeh's motion was whether he could be held vicariously liable for Hammond's alleged negligence. The trial court found that, although Dr. Zeh could not be held vicariously liable under an actual agency theory, he was vicariously liable for Hammond's conduct under the PAA. The trial court certified its order for immediate review. After this Court granted Dr. Zeh's interlocutory application, the appeal in Case No. A22A1289 followed. In Case No. A22A1290, Maso cross-appealed from the trial court's order denying her motions to exclude the testimony of the two defense experts.

*Case No. A22A1289*

1. The Northside defendants contend that the trial court erred in denying Dr. Zeh's motion for summary judgment. Specifically, they argue that the trial court erred in finding that the PAA creates vicarious liability for supervising physicians for the medical acts of their PAs. We agree.

In 2009,

> [t]he General Assembly enacted the [PAA] to encourage the more effective utilization of the skills of physicians by enabling them to delegate health care tasks to [PAs] where such delegation is consistent with the patient's health and welfare. OCGA § 43-34-101 (b). Under this Act, a [PA] may be licensed to perform patients' services for which the PA has been found qualified to perform by academic and practical

3

training. OCGA §§ 43-34-102 (5), 43-34-103 (a). The Act establishes an application procedure to be followed to obtain approval by the [Georgia Composite Medical Board], the board charged with overseeing PAs, for the performance of specific medical tasks set forth in the proposed PA's job description. A PA is limited to those tasks set forth in the job description except when the task is performed under the direct supervision and in the presence of the physician utilizing the PA, OCGA § 43-34-105, in which case the [PA] may perform any work authorized for physicians that the assistant is competent to do.

(Citation and punctuation omitted.) *Cardio TVP Surgical Associates v. Gillis*, 272 Ga. 404, 404-405 (1) (528 SE2d 785) (2000).

OCGA § 43-34-102 (9) defines "primary supervising physician" as "the physician to whom the board licenses a physician assistant pursuant to a board approved job description and who has the primary responsibility for supervising the practice of a physician assistant pursuant to that physician assistant's job description." An "alternate supervising physician" is "a physician to whom a board approved primary supervising physician has delegated the responsibility of supervising a physician assistant who is licensed to that primary supervising physician and who agrees to supervise the physician assistant for the primary supervising physician and who is on record with the board." OCGA § 43-34-102 (2).

4

OCGA § 43-34-109 governs the involvement of a supervising physician in a patient's care and provides as follows:

> When a patient receives medical services from a physician assistant, the supervising physician's involvement in the patient's care, including patient evaluation and follow-up care by the supervising physician, shall be appropriate to the nature of the practice and the acuity of the patient's medical issue, as determined by the supervising physician.

The PAA does not directly address the question of whether a supervising physician is vicariously liable for the negligent acts of a PA. Maso's argument that the PAA confers vicarious liability on supervising physicians is based on OCGA § 43-34-103.

> OCGA § 43-34-103 (a) (2) provides, in pertinent part:

> In order to obtain approval for the utilization of a physician assistant, whether the utilization is in a private practice or through a public or private health care institution or organization, the licensed physician who will be responsible for the performance of such physician assistant shall submit an application to the board which shall include [evidence the PA is licensed, a job description in accordance with 43-34-102 (4); and a fee, if required].

OCGA § 43-34-103 (e.1) (1) provides, in pertinent part:

5

[A] physician may delegate to a physician assistant . . . the authority to issue a prescription drug order or orders for any device . . . . Delegation of such authority shall be contained in the job description required by this Code section. The delegating physician shall remain responsible for the medical acts of the physician assistant performing such delegated acts and shall adequately supervise the physician assistant.

Maso argues that the terms "responsible" and "liable" are interchangeable, and that by using the word "responsible" in OCGA § 43-34-103, the General Assembly intended to create vicarious liability for supervising physicians. According to Maso, the General Assembly has previously enacted statutes regarding vicarious liability that use the terms "responsible" and "liable" interchangeably. In support of this contention, Maso cites OCGA § 51-2-4, which provides that "[a]n employer generally is not responsible for torts committed by his employee when the employee exercises an independent business and in it is not subject to the immediate direction and control of the employer." However, Maso has not cited, and we have not found, any Georgia statute that *imposes* legal liability using solely the term "responsible." By contrast, many Georgia statutes that impose legal liability use the word "liable." See, e.g., OCGA § 51-1-22 (The owner of a vessel *shall be liable* for any injury or damage occasioned by the negligent operation of the vessel . . . ."); OCGA § 51-2-3 ("Every

6

parent or guardian having the custody and control over a minor child or children under the age of 18 *shall be liable* . . . for the willful or malicious acts of the minor child . . . ."); OCGA § 51-2-5 ("An employer *is liable* for the negligence of a contractor . . . [under specific circumstances]."); OCGA § 51-2-7 ("A person who owns or keeps a vicious or dangerous animal . . . and who . . . causes injury to another person . . . *may be liable* in damages to the person so injured."); OCGA § 51-7-81 ("Any person who takes an active part in the initiation, continuation, or procurement of civil proceedings against another *shall be liable* for abusive litigation if such person acts . . . [w]ith malice; and . . . [w]ithout substantial justification."). Consequently, Maso's argument that the General Assembly intended to create vicarious liability for supervising physicians by using the word "responsible" in OCGA § 43-34-103 is unpersuasive.

The Northside defendants, on the other hand, argue that the PAA was never intended to and does not create new tort liability for supervising physicians. They maintain that nothing in the PAA indicates that the General Assembly meant to enact a fundamental change to existing vicarious liability law when it enacted the PAA.

Before the PAA was passed, physicians could be vicariously liable for the negligence of other medical personnel based on principles of respondeat superior,

7

agency, and imputed negligence. See *Hendley v. Evans*, 319 Ga. App. 310, 315 (2) (a) (iii) (734 SE2d 548) (2012) (trial court erred in failing to charge the jury on physician's potential vicarious liability for the negligence of hospital personnel either "by modifying the [plaintiffs'] requested charge on the borrowed servant doctrine, by giving one of the other instructions requested by the [plaintiffs] on the principles of respondeat superior, agency or imputed negligence, or by devising its own charge on the issue"). The General Assembly is presumed to have been aware of existing law, including vicarious liability principles, when it enacted the PAA. See generally *In the Interest of H. E. B.*, 303 Ga. App. 895, 896-897 (695 SE2d 332) (2010) ("all statutes are presumed to be enacted by the legislature with full knowledge of the existing law and with reference to it; they are therefore to be construed in connection and in harmony with the existing law.") (citation and punctuation omitted). As noted above, the language of the PAA does not expressly impose vicarious liability on supervising physicians for the negligent acts of their PAs. The General Assembly knows how to impose liability by statute when it chooses to, and we will not read into the PAA language that the General Assembly did not include. Therefore, we conclude that the trial court erred in finding that the PAA creates vicarious liability for supervising

8

physicians for the medical acts of their PAs and we reverse the denial of summary judgment to Dr. Zeh.

*Case No. A22A1290*

2. In her cross-appeal, Maso contends that the trial court erred when it denied her motion to exclude expert testimony by two witnesses. Where, as here, the trial court has conducted a hearing pursuant to OCGA § 24-7-702 (d) to determine the admissibility of expert testimony, we review the trial court's determination for an abuse of discretion. *Fields v. Taylor*, 340 Ga. App. 706, 709 (2) (797 SE2d 127) (2017). As the proponents of the expert testimony at issue, the Northside defendants had the duty to show its admissibility. See *Robles v. Yugueros*, 343 Ga. App. 377, 380 (1) (807 SE2d 110) (2017).

(a) Maso first argues that the trial court erred by denying her motion to exclude standard of care testimony by Laura K. Knoblauch because Knoblauch fails to satisfy the requirements of OCGA § 24-7-702 (c) (2) (A). We agree.

OCGA § 24-7-702 governs the admissibility of opinion testimony by expert witnesses in civil cases. See *Dubois v. Brantley*, 297 Ga. 575, 580 (2) (775 SE2d 512) (2015). For medical malpractice cases, OCGA § 24-7-702 (c) (2) requires that an expert has

9

actual professional knowledge and experience in the area of practice or specialty in which the opinion is to be given as the result of having been regularly engaged in:

(A) The active practice of such area of specialty of his or her profession for at least three of the last five years, with sufficient frequency to establish an appropriate level of knowledge, as determined by the judge, in performing the procedure, diagnosing the condition, or rendering the treatment which is alleged to have been performed or rendered negligently by the defendant whose conduct is at issue; or

(B) The teaching of his or her profession for at least three of the last five years as an employed member of the faculty of an educational institution accredited in the teaching of such profession, with sufficient frequency to establish an appropriate level of knowledge, as determined by the judge, in teaching others how to perform the procedure, diagnose the condition, or render the treatment which is alleged to have been performed or rendered negligently by the defendant whose conduct is at issue[.]

"[E]ven if an expert is generally qualified as to the acceptable standard of conduct of the medical professional in question, the expert cannot testify unless he also satisfies the specific requirements of [OCGA § 24-7-702] (c) (2)." (Citation and punctuation omitted.) *Dubois*, 297 Ga. at 586 (2), n. 12.

Knoblauch earned a master's degree as an anesthesiologist assistant in December 2015 and began working as an anesthesiologist assistant in February 2016. Maso maintains that Knoblauch fails to satisfy the requirements of OCGA § 24-7-702 (c) (2) (A) because she was not engaged in the active practice of the anesthesiologist assistant profession for at least three of five years preceding June 18, 2018, the date

10

of Hammond's alleged negligence. The Northside defendants argue that because Knoblauch provided clinical care to patients as a part of her training, she was actively practicing in the specialty of anesthesiology for approximately five years prior to 2018.

Neither party has cited case law holding that care provided as a student before obtaining a professional degree can constitute the "active practice" of a profession under OCGA § 24-7-702 (c) (2) (A), and we have found none. The Northside defendants rely on *Emory-Adventist, Inc. v. Hunter*, 301 Ga. App. 215, 219 (1) (687 SE2d 267) (2009) and *Craigo v. Azizi*, 301 Ga. App. 181, 185 (2) (687 SE2d 198) (2009) in support of their argument that the fact that Knoblauch was in training for part of the three year period before the alleged malpractice does not affect her competency to testify as an expert. In *Emory-Adventist*, this Court considered whether a physician must be licensed to engage in the "active practice" of medicine. *Emory-Adventist*, 301 Ga. App. at 216 (1). We concluded that a physician who was a resident and not licensed to practice medicine during part of the requisite time period was competent to testify because the plain terms of OCGA § 24-9-67.1 (c) (the predecessor of OCGA § 24-7-702 (c)) only imposed a license requirement at the time of the alleged malpractice. Id. at 216, 219 (1). In that case, we did not consider

11

whether the physician was engaged in the active practice of medicine while he was in medical school.

Similarly, in *Craigo*, 301 Ga. App. at 184-185 (2), the Court of Appeals considered whether a resident physician in anesthesiology was engaged in the active practice of the profession while working as a resident (rather than an attending physician). We concluded that "years spent as a resident physician can count as years of 'active practice' for purposes of [the predecessor of OCGA § 24-7-702 (c) (2) (A)]." Id. at 185 (2). Of significance to the present case, we stated that "once [the resident physician] received his medical degree and embarked upon his residency in anesthesiology, he was engaged in the 'active practice of such area of specialty' within the meaning of [the predecessor to OCGA § 24-7-702 (c) (2) (A)]." Similarly, we conclude here that Knoblauch was not engaged in the active practice of her profession until after she received her master's degree and began working in her area of speciality in February 2016. Consequently, the trial court abused its discretion when it found that Knoblauch was qualified to give an opinion under OCGA § 24-7-702 and denied Maso's motion to exclude Knoblauch's testimony.

(b) Maso also contends that the trial court erred by denying her motion to exclude the expert testimony of Peter Draganov, M.D. Specifically, Maso argues that

his opinions fail to satisfy the requirements of OCGA § 24-7-702 (b) because they are not reliable. We disagree.

"Under OCGA § 24-7-702 (b), the testimony of a qualified expert is admissible if (1) it is based upon sufficient facts or data; (2) it is the product of reliable principles and methods; and (3) the expert witness has applied the principles and methods reliably to the facts of the case." (Citation and punctuation omitted.) *Wilson v. Redmond Constr.*, 359 Ga. App. 814, 819 (2) (860 SE2d 118) (2021). "Under OCGA § 24-7-702, it is the role of the trial court to act as a gatekeeper of expert testimony. In this role, the trial court assesses both the witness' qualifications to testify in a particular area of expertise and the relevancy and reliability of the proffered testimony." (Citations and punctuation omitted.) Id.

> In doing this, the trial court considers whether: (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert v. Merrell Dow Pharmaceuticals*, 509 U. S. 579 (113 SCt 2786, 125 LE2d 469) (1993); and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue. While there is inevitably some overlap among the basic requirements —

qualification, reliability, and helpfulness — they remain distinct concepts and the courts must take care not to conflate them.

(Citation and punctuation omitted.) Id. "In making this assessment, however, the trial court may not exclude an otherwise sufficient expert opinion simply because it believes that the opinion is not — in its view — particularly strong or persuasive. The weight to be given to admissible expert testimony is a matter for the jury." (Citation and punctuation omitted.) Id.

"The trial court has broad discretion in deciding how to assess the reliability of expert testimony. This discretion affords the trial court considerable leeway in deciding which tests or factors to use to assess the reliability of an expert's methodology." (Citations and punctuation omitted.) *Wilson*, 359 Ga. App. at 820 (3).

Dr. Draganov intends to testify that an air embolism is one possible explanation for Dr. Maso's rapid deterioration. The trial court's ruling addressed the reliability of Dr. Draganov's testimony:

> through his deposition and affidavit testimony, Dr. Draganov has provided a sufficiently reliable explanation for his causation opinion such that exclusion of his testimony is not warranted.
>
> Specifically, the record demonstrates that Dr. Draganov is a nationally-known, highly regarded specialist in his field, and the plaintiffs make no attempt to challenge his qualifications. During his

14

career he personally has performed thousands of endoscopic procedures, including ERCPs. In addition to his clinical responsibilities, academic duties, professional society leadership, and editorial board commitments, he also has been very active in researching and publishing on a variety of gastroenterology topics, including the risk of air embolism. He has particular interest in the prevalence of air embolism, has personally published three articles regarding that phenomenon, and has personally experienced air embolism during an ERCP procedure.

Dr. Draganov also is familiar with the existing literature and the prevailing thoughts on the risk factors that increase a patient's risk of suffering an air embolism during a procedure. Relying on his education, training, personal experience, literature survey, and research, Dr. Draganov identified five risk factors specific to Dr. Maso which increased his risk of suffering an air embolism. Thus, Dr. Draganov's opinion is not merely a theoretical, speculative possibility; rather, it is derived from his personal experience and knowledge, research and writing that he has conducted, his familiarity and knowledge of current medical thought applied specifically to Dr. Maso, and the risk factors that predisposed him to air embolism.

We conclude that the trial court did not abuse its discretion in denying Maso's motion to exclude Dr. Draganov's testimony. The trial court's order adequately demonstrates that the trial court performed its role as gatekeeper, and the trial court's broad discretion afforded it "considerable leeway in deciding how to assess the reliability

of [Dr. Draganov's] opinion." *Emory Univ. v. Willcox*, 355 Ga. App. 542, 545 (2) (844 SE2d 889) (2020).

*Judgment affirmed in part and reversed in part in Case No. A22A1290. Judgment reversed in Case No. A22A1289. Miller, P. J., and Pipkin, J., concur.*