**FOURTH DIVISION**
**DOYLE, P. J.,**
**MCFADDEN and BOGGS, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules/**

**July 12, 2013**

# In the Court of Appeals of Georgia

A13A0348. BONDS et al. v. NESBITT.

MCFADDEN, Judge.

Deborah Bonds sued Dr. Reginald Charles Nesbitt for the death of her husband, alleging that Dr. Nesbitt failed to provide necessary emergency treatment. The trial court granted Dr. Nesbitt partial summary judgment, ruling that OCGA § 51-1-29.5 applies. Under that statute, a plaintiff must prove gross negligence by clear and convincing evidence to recover in medical malpractice actions arising out of the provision of emergency medical services.

Bonds appeals, arguing that the cause of action does not arise out of the provision of emergency services but instead out of Dr. Nesbitt's *failure* to provide appropriate emergency services. Consequently, she argues, the statute does not apply, she need only prove her case by a preponderance of the evidence, and a jury may hold

Dr. Nesbitt liable if it finds that he acted negligently. Bonds also challenges rulings allowing testimony of a defense expert witness, excluding testimony of one of her expert witnesses, and allowing Dr. Nesbitt to depose a plaintiff's expert for a second time.

We find that the trial court correctly ruled that the undisputed evidence shows that at least some of Dr. Nesbitt's treatment of Mr. Bonds arose in the context of the provision of emergency medical services, thereby triggering application of the statute. But the evidence is conflicting on the issue of whether Mr. Bonds at some point became stable and capable of receiving non-emergency medical services, thereby triggering an exception to the statute. Accordingly, we affirm in part and reverse in part the trial court's summary judgment that OCGA § 51-1-29.5 applies to Mrs. Bonds' cause of action. Because the trial court did not abuse its discretion in its expert-witness rulings or its ruling on the deposition issue, we affirm those rulings.

1. *OCGA § 51-1-29.5.*

We review the grant of summary judgment de novo, viewing the evidence in the record, as well as all inferences that might reasonably be drawn from that evidence, in the light most favorable to the non-moving party. *Cowart v. Widener*, 287 Ga. 622, 624 (1) (697 SE2d 779) (2010). Viewed in this light, the evidence

2

shows that on Friday, January 12, 2007, Billy Curtis Bonds was diagnosed with pneumonia. The following Tuesday evening, he had not improved; he had vomited repeatedly and was experiencing nausea and dizziness. Mrs. Bonds drove her husband to the hospital. They arrived at the hospital at 7:30 p.m., and Mr. Bonds was triaged at 7:35 p.m. He complained of abdominal pain and that he was nauseated, vomiting and dizzy. The triage assessment documentation included a section for the triage nurse to indicate the level of potential threat, giving two applicable choices: "none apparent" and "requires immediate life saving intervention," which applies, for example, when someone is not breathing or does not have a pulse. The nurse selected "none apparent." The document also had a section to rate "initial acuity," with a range from one, meaning the most acute, to five, meaning the least acute. The nurse indicated two, which meant that Mr. Bonds needed to go straight back to the emergency room to see a doctor as soon as possible.

At 7:45 p.m. Mr. Bonds was taken to a room in the emergency department where, within 15 minutes, Dr. Nesbitt had initially evaluated him. Dr. Nesbitt ordered the administration of fluids by IV and multiple pain medications, including Diluadid and morphine. Dr. Nesbitt ordered laboratory blood tests, an EKG, and blood cultures

to determine whether Mr. Bonds had a bacterial or yeast infection. Dr. Nesbitt also ordered a CT scan of Mr. Bonds' abdomen.

According to Dr. Nesbitt, Mr. Bonds was still undergoing evaluation in the emergency department at least until 10:30 p.m.. Based on Mr. Bonds' symptoms and Dr. Nesbitt's examination, Dr. Nesbitt reached a differential diagnosis that was mainly intra-abdominal, including the possibilities of pancreatitis, cholecystitis, cholelithiasis, gastritis and peptic ulcer disease. At some point, Dr. Nesbitt signed a document to admit Mr. Bonds to the floor, indicating that Mr. Bonds was experiencing acute renal failure and hypertension but that his condition had improved by 11:30 p.m. and that he was stable. While Mr. Bonds was awaiting a room, Dr. Nesbitt continued to treat him at least until 12:44 a.m., when another doctor took over his care. Before he was moved to a room, Mr. Bonds became agitated, tossing on the bed and entangling himself in the wires from the machines. He was moved to a room on the third floor of the hospital at 2:00 a.m. He began thrashing about and complaining that he could not breathe. At 2:41 a.m., Mr. Bonds went into respiratory and cardiac arrest. Mr. Bonds was resuscitated and was moved to the ICU at 3:05 a.m., where he again went into cardiopulmonary arrest. He was pronounced dead at 4:00 a.m.

OCGA § 51-1-29.5 (c) provides:

In an action involving a health care liability claim arising out of the provision of emergency medical care in a hospital emergency department . . ., no physician or health care provider shall be held liable unless it is proven by clear and convincing evidence that the physician or health care provider's actions showed gross negligence.

OCGA § 51-1-29.5 (a) (5) defines "[e]mergency medical care" as

bona fide emergency services provided after the onset of a medical or traumatic condition manifesting itself by acute symptoms of sufficient severity, including severe pain, such that the absence of immediate medical attention could reasonably be expected to result in placing the patient's health in serious jeopardy, serious impairment to bodily functions, or serious dysfunction of any bodily organ or part. The term does not include medical care or treatment that occurs after the patient is stabilized and is capable of receiving medical treatment as a nonemergency patient or care that is unrelated to the original medical emergency.

Mrs. Bonds argues that whether Dr. Nesbitt provided emergency medical care, and therefore whether the statute applies to her malpractice action against him, is a jury question.

We agree with the trial court that there is no material question of fact that when Dr. Nesbitt began his care of Mr. Bonds, he was providing emergency medical care

5

as defined by OCGA § 51-1-29.5 (a) (5). Mr. Bonds was experiencing a medical condition with acute symptoms of sufficient severity, including pain, repeated vomiting, dizziness and nausea, such that the absence of immediate medical attention could reasonably be expected to result in placing his health in serious jeopardy. This expectation is evidenced by the fact that he was triaged with an acuity level of two, that within 15 minutes of his arrival in a room, Dr. Nesbitt had examined him and ordered the administration of fluids by IV and multiple pain medications, including Diluadid and morphine, and that Dr. Nesbitt ordered multiple diagnostic tests, including laboratory blood tests, an EKG, blood cultures and a CT scan.

Mrs. Bonds argues that Dr. Nesbitt's failure to recognize the severity of Mr. Bonds' condition and to provide the necessary care means that the statute does not apply. We disagree. "In all interpretations of statutes, the courts shall look diligently for the intention of the General Assembly. . . ." OCGA § 1-3-1 (a). "The legislative intent is determined from a consideration of the entire statute." *Restina v. Crawford*, 205 Ga. App. 887, 888 (424 SE2d 79) (1992).

OCGA § 51-1-29.5 (a) (7) defines "[h]ealth care" as "any act or treatment performed or furnished, *or that should have been performed or furnished*, by any health care provider for, to, or on behalf of a patient during the patient's medical care,

6

treatment, or confinement." (Emphasis supplied.) OCGA § 51-1-29.5 (a) (9) defines "[h]ealth care liability claim" as "a cause of action against a health care provider or physician for treatment, *lack of treatment*, or other claimed departure from accepted standards of medical care, . . . which departure from standards proximately results in injury to or death of a claimant." (Emphasis supplied.) It is clear from these definitions, in the context of the statute as a whole, that the legislature anticipated that a health care liability claim arising out of the provision of emergency medical care in a hospital emergency department, and thus a claim subject to the statute, could include allegations that a physician failed to provide appropriate treatment, thereby violating the accepted standard of medical care.

But OCGA § 51-1-29.5 (a) (5) excludes from its definition of emergency medical care "medical care or treatment that occurs after the patient is stabilized and is capable of receiving medical treatment as a nonemergency patient. . . ." So the services provided by Dr. Nesbitt were "emergency medical care" until such time as Mr. Bonds was stabilized and the absence of such services would not have placed his health in serious jeopardy.

The statute provides that a doctor's conduct becomes subject to the more rigorous ordinary negligence standard of care rather than the gross negligence

7

standard when the patient's condition improves, or at least stabilizes. In other words, the statute provides that the condition of the patient controls, not the opinion of the physician. If a physician or health care provider mistakenly concludes that a patient has become "stabilized" and "capable of receiving medical treatment as a nonemergency patient" and therefore stops providing emergency care to that patient – notwithstanding that the patient still needs emergency care – and if the patient is injured or killed as a result of the withdrawal of emergency care, the physician or health care provider is entitled to claim the protection of the gross negligence standard.

But at least in this case, that claim must be made to the jury. A doctor's determination that a patient has stabilized is some evidence that the patient has in fact stabilized. While Mrs. Bonds' expert witness testified that Mr. Bonds' condition never become stable while he was in the emergency room, Dr. Nesbitt determined, at some point, that Mr. Bonds was stable. The doctor also determined that Mr. Bonds could be transferred to a regular hospital room, an indication that he believed Mr. Bonds no longer required emergency medical care. Viewing this evidence and all reasonable inferences in the light most favorable to Mrs. Bonds, we conclude that whether Mr. Bonds at some point had "stabilized and [was] capable of receiving

8

medical treatment as a nonemergency patient" within the meaning OCGA § 51-1-29.5 (a) (5) is a question for the trier of fact. The trial court erred by granting Dr. Nesbitt summary judgment on the issue of whether the exception applies.

2. *Causation testimony of Dr. Anne Neff.*

Mrs. Bonds argues that the trial court should have excluded the expert testimony of Dr. Anne Neff because Dr. Neff did not meet the criteria of OCGA § 24-9-67.1 (b). (With minor changes, that statute is carried forward in the new evidence code at OCGA § 24-7-702 (b), which became effective January 1, 2013. *Walls v. Walls*, 291 Ga. 757, 758 (3) n. 3 (732 SE2d 407) (2012).) "The issue of the admissibility or exclusion of expert testimony rests in the broad discretion of the court, and consequently, the trial court's ruling thereon cannot be reversed absent an abuse of discretion." (Citations omitted.) *MCG Health, Inc. v. Barton*, 285 Ga. App. 577, 580 (1) (647 SE2d 81) (2007).

Former OCGA § 24-9-67.1 (b) provided that a witness qualified as an expert may give opinion testimony if:

> (1) The testimony is based upon sufficient facts or data which are or will be admitted into evidence at the hearing or trial; (2) The testimony is the product of reliable principles and methods; and (3) The witness has applied the principles and methods reliably to the facts of the case.

9

Mrs. Bonds argues, in effect, that because no witness other than Dr. Neff concluded that a pulmonary embolism caused Mr. Bonds' death, because Dr. Neff has no experience in diagnosing pulmonary embolisms and because no medical evidence showed a pulmonary embolism, Dr. Neff's opinion is unreliable.

Dr. Neff testified that in her practice, she acts as a consultant on the causation of pulmonary embolisms. She testified that she reached a differential diagnosis that a pulmonary embolism caused Mr. Bonds' death. She based her conclusion on Mrs. Bonds' testimony describing the evening of his death, particularly her testimony that just before his death, Mr. Bonds complained of the inability to breathe; his development of pulseless electrical activity; and his higher risk for pulmonary embolism, given his hemoglobin and hematocrit readings, his immobility due to illness, his dehydration, his diagnosis of pneumonia, and his excessive weight. She also testified that she consulted emergency room physicians about some of Mr. Bonds' test readings and conducted research on the issues.

Given Dr. Neff's testimony about her background, her consultation with other physicians, and her reasons for reaching her differential diagnosis, Mrs. Bonds has not shown that the trial court abused its discretion in allowing the testimony. *Perry*

10

*v. Gilotra-Mallik*, 314 Ga. App. 764, 769 (4) (726 SE2d 81) (2012); *Bd. of Regents &c. v. Casey*, 300 Ga. App. 850, 851-853 (1), (2) (686 SE2d 807) (2009).

3. *The standard of care testimony of Dr. Robert Balk.*

Mrs. Bonds argues that the trial court abused its discretion in ruling that although Dr. Robert Balk could testify as a causation expert, he could not testify as a standard of care expert. "Whether a witness is qualified to render an opinion as an expert is a legal determination for the trial court and will not be disturbed absent a manifest abuse of discretion." *Mason v. Home Depot U.S.A.*, 283 Ga. 271, 279 (658 SE2d 603) (2008).

In relevant part, former OCGA § 24-9-67.1 (c), which was replaced by OCGA § 24-7-702 (c) effective January 1, 2013, provided that the opinions of an expert, who is otherwise qualified as to the acceptable standard of conduct of the professional whose conduct is at issue, will be admissible in a medical malpractice action only if the expert

> had actual professional knowledge and experience in the area of practice or specialty in which the opinion is to be given as the result of having been regularly engaged in [t]he active practice of such area of specialty of his or her profession for at least three of the last five years, with sufficient frequency to establish an appropriate level of knowledge, as determined by the judge, in performing the procedure, diagnosing the

11

condition, or rendering the treatment which is alleged to have been performed or rendered negligently by the defendant whose conduct is at issue . . . .

(Punctuation omitted.) OCGA § 24-9-67.1 (c) (2) (A). "[T]he requirement that the expert have 'actual professional knowledge and experience in the area of practice or specialty in which the opinion is to be given,' " *Nathans v. Diamond*, 282 Ga. 804, 806 (1) (654 SE2d 121) (2007), does not mean that the plaintiff's expert must "have knowledge and experience in the 'same area of practice/specialty as the defendant doctor," id., but instead means that the expert must have "knowledge and experience in the practice or specialty that is relevant to the acts or omissions that the plaintiff alleges constitute malpractice and caused the plaintiff's injuries." Id.

Here, Mrs. Bonds' complaint and attached expert affidavit from an emergency medicine physician make clear that the alleged negligence was Dr. Nesbitt's failure to properly diagnose and treat Mr. Bonds' illness while he was in the emergency room under Dr. Nesbitt's care. Whether a witness has "actual professional knowledge and experience in the area of practice or specialty in which the opinion is to be given," OCGA § 24-9-67.1 (c) (2) (A),

> turns on whether the expert's knowledge and experience is relevant to the acts or omissions that the plaintiff alleges constitute[d] malpractice

12

and caused the plaintiff's injuries. But a minimum level of knowledge in the area in which the opinion is to be given is insufficient; instead, an expert must be both familiar with the standard of care at issue and also demonstrate specific experience in the relevant practice area.

(Citation omitted.) *Dawson v. Leder*, 294 Ga. App. 717, 719 (1) (669 SE2d 720) (2008).

Dr. Balk works in the field of pulmonary and critical care medicine. He is board certified in internal, pulmonary and critical care medicine. He does not practice medicine in the emergency room although he is sometimes asked to consult there. Balk testified that his opinion is that "it was not recognized that [Mr. Bonds] was critically ill and in need of volume resuscitation . .. and appropriate antibiotic administration and diagnostic testing." He testified that he would not comment on Dr. Nesbitt's actions "compared to an ER physician, but I would comment on his management of this patient who presents with severe sepsis and septic shock."

The trial court ruled that although Dr. Balk "was qualified to give expert medical testimony as to causation concerning a diagnosed condition of sepsis," he could not testify about the standard of care. The court defined the applicable standard of care in terms of "a medical specialty which involves the diagnosis and treatment of . . . patients who present in an emergency room sitting with multiple symptoms

13

resulting in a complicated differential diagnosis." And because Mrs. Bonds had not shown that Balk "regularly engaged in the specialty of emergency medicine or that he ha[d] established an appropriate level of knowledge with respect to the speciality of emergency medicine in terms of the statute . . ." he could not testify about the applicable standard of care.

Properly tailoring its order to its review of the evidence of Dr. Balk's qualifications, the trial court determined that Dr. Balk had the necessary expertise to give his opinion on causation in regards to sepsis, but not to give his opinion on the applicable standard care. The trial court did not manifestly abuse its discretion in excluding standard of care testimony on the ground that Dr. Balk is not sufficiently familiar with the standard of care at issue and does not have specific experience in the relevant practice area. See *Aguilar v. Children's Healthcare of Atlanta*, __ Ga. App. __, __ (__ SE2d __) (Case No. A12A1790, decided Mar. 5, 2013) (in action alleging plaintiff's ten-month-old son died as a result of the improper insertion of an intubation tube, trial court did not abuse its discretion in ruling plaintiff's expert, who had experience in internal medicine and pediatrics and had performed intubations on infants, did "not have the requisite experience in the area in which his opinion is

given, either pediatric emergency medicine or the even broader area of emergency medicine.")

4. *Reopening discovery.*

The trial court reopened discovery for the limited purpose of allowing Dr. Nesbitt to depose Dr. Janiak about the matters set forth in an affidavit he gave in opposition to Dr. Nesbitt's motion for summary judgment. This affidavit was filed after Janiak provided the plaintiff's OCGA § 9-11-9.1 affidavit and after he already had been deposed. "A trial court has wide discretion to shorten, extend, or reopen the time for discovery, and its decision will not be reversed unless a clear abuse of that discretion is shown." *Woelper v. Piedmont Cotton Mills*, 266 Ga. 472, 473 (1) (467 SE2d 517) (1996). Mrs. Bonds has not shown that the trial court abused its wide discretion.

*Judgment affirmed in part and reversed in part. Doyle, P. J., and Boggs, J., concur.*