**FIFTH DIVISION**
**MCFADDEN, C.J.,**
**MCMILLIAN, P.J. and MERCIER, J.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**October 10, 2019**

# In the Court of Appeals of Georgia

A19A1552, A19A1553. LOWNDES COUNTY HEALTH SERVICES, LLC v. COPELAND et al; and vice versa.

MERCIER, Judge.

Following the death of Bobby Copeland ("Bobby"), Gregory Copeland, individually and as Bobby's son, and Marier House, as the administrator of Bobby's estate, (collectively, "the plaintiffs") sued Lowndes County Health Services, LLC d/b/a Heritage Healthcare at Holly Hill ("Holly Hill") for wrongful death and other damages. A jury found Holly Hill liable for both professional and ordinary negligence. It awarded the plaintiffs over $7.6 million in damages, but allocated fault between Holly Hill and four non-parties to the trial. Based on the jury's allocation of fault, the trial court entered final judgment for the plaintiffs against Holly Hill for $1,524,240.

In Case No. A19A1552, Holly Hill appeals the final judgment entered on the jury's verdict and the denial of its motion for new trial, arguing that the trial court erred in (1) rejecting its challenge to the plaintiffs' use of a peremptory jury strike, and (2) denying its motion for directed verdict on plaintiffs' negligent staffing claim. In their cross-appeal in Case No. A19A1553, the plaintiffs assert that the trial court erred in (1) denying their motion for directed verdict as to apportionment, and (2) using a misleading and confusing special verdict form. For reasons that follow, we affirm.

Viewed in the light most favorable to the jury's verdict, see *Ford Motor Co. v. Gibson*, 283 Ga. 398, 399 (659 SE2d 346) (2008), the evidence showed that Bobby lived at Holly Hill, a skilled nursing facility in Valdosta, from 2001 until his death in 2012 at the age of 71. Around 10:45 p.m. on October 25, 2012, Faye Jenkins, a licensed practical nurse ("LPN") employed by Holly Hill and assigned to the 11:00 p.m. to 7:00 a.m. "night shift," entered Bobby's room and saw brown vomit on his clothing. Noting that Bobby's stomach was "slightly distended," Jenkins listened to his abdomen with her stethoscope and detected "a lack of bowel sounds in three of four quadrants[.]" She then called Shawn Tywon, physician's assistant to Dr. Douglas

Moss, Holly Hill's medical director.[1] Jenkins related her observations and asked whether Bobby should go to the hospital for evaluation. Tywon told her not to send Bobby to the hospital, but he ordered a blood test, an abdominal x-ray, and nausea medication for Bobby. Jenkins checked on Bobby throughout her shift. She heard him moan at one point during the night and noticed no change in his bowel sounds.

As the end of her shift approached on October 26, 2012, Jenkins reported Bobby's condition to the nurse coming on duty at 7:00 a.m., as well as to Registered Nurse ("RN") Lisa Sirmans, Holly Hill's Assistant Director of Nursing, who arrived at the facility around 6:30 a.m. Concerned about Bobby, Jenkins asked Sirmans "to please get something done about this resident," and Sirmans responded that "she would." According to Bobby's medical chart, however, he was not actually assessed until 9:15 a.m., when Kaye Frazier, an RN who served as Holly Hill's Director of Nursing, examined him. Frazier noted that Bobby's abdomen was distended and that he was complaining of abdominal pain.

The x-ray ordered the night before by Tywon was completed at Holly Hill just before 10:00 a.m. Tywon examined Bobby at 10:15 a.m., and approximately 45

---

[1] The plaintiffs originally named Moss and Tywon as defendants in this action, but they settled with the plaintiffs prior to trial. Although Moss and Tywon provided care for Holly Hill residents, it appears that they were not employed by Holly Hill.

minutes later, an ambulance transported Bobby to South Georgia Medical Center ("SGMC"), where he was treated in the emergency room by a team that included Dr. Matthew Shannon, Moss, and Tywon. Bobby was transferred to the hospital's intensive care unit around 5:30 p.m. He died later that night from complications related to aspirating fecal material, a risk associated with bowel obstructions.

The jury found Holly Hill liable to the plaintiffs in both professional and ordinary negligence, and it awarded the plaintiffs over $7.5 million in compensatory damages. Jurors, however, allocated only 20 percent of the fault to Holly Hill. They apportioned the remainder of the fault to non-parties Tywon (35 percent), Moss (35 percent), SGMC (5 percent), and Shannon (5 percent). The trial court entered judgment against Holly Hill for 20 percent of the damages awarded, and these appeals followed.

*Case No. A19A1552*

1. Holly Hill argues that the trial court erred in denying its motion, brought pursuant to *Batson v. Kentucky*, 476 U. S. 79 (106 SCt 1712, 90 LE2d 69) (1986), challenging the plaintiffs' decision to strike Juror No. 11 from the jury pool. In *Batson*, the United States Supreme Court barred the government from striking prospective jurors from a jury panel based upon race. See id. at 84-89 (II) (A) & (B);

4

*AIKG, LLC v. Marshall*, 350 Ga. App. 413, 418 (829 SE2d 608) (2019). The Supreme Court later extended this holding to civil litigants, prohibiting race-based peremptory strikes in civil trials. See *Edmonson v. Leesville Concrete Co.*, 500 U. S. 614, 630 (II) (B) (111 SCt 2077, 114 LEd2d 660) (1991); *AIKG, LLC*, supra.

In both criminal and civil proceedings, a *Batson* challenge is analyzed using a three-pronged test:

> (1) the opponent of a peremptory challenge must make a prima facie showing of racial discrimination; (2) the proponent of the strike must then provide a race-neutral explanation for the strike; and (3) the court must decide whether the opponent of the strike has proven discriminatory intent.

*AIKG, LLC*, supra (citation omitted). On appeal, we are mindful that the trial court's resolution of a *Batson* motion "rests largely upon assessment of the proponent's state of mind and credibility; it therefore lies peculiarly within a trial judge's province." Id. (citation omitted). A trial court's determination as to whether the opponent of a jury strike proved discriminatory intent is "entitled to great deference and will be affirmed unless clearly erroneous." Id. (citation omitted).

Noting that all six of the individuals stricken by plaintiffs' counsel were white, Holly Hill argued at trial that the strikes "ha[d] to do with race." In response,

5

plaintiffs' counsel provided the reasoning behind the strikes. As to Juror No. 11, counsel stated:

> [Juror No. 11] works in a sheet metal factory. He works in South Lowndes County which based off our demographic research of this group and with our discussion with other counsel who are right in this area, suggested that they may not be [an] area that is friendly towards African Americans which our client is. So, we have concerns based off his blue-collar employment, as well as . . . the demographics of where he resides that he may have some innate prejudice toward our client.
>
> . . .
>
> In addition, . . . this is one of the jurors about whom we have the least information. We know that he's married and is a sheet metal worker and works cranes and lives in . . . South Lowndes, . . . and beyond that, we don't really have much information. He was a big question mark in our minds because nobody really developed his testimony much.

After the plaintiffs' explanation, counsel for Holly Hill asserted:

> [T]hat was the basis of my [*Batson*] objection as we did not have much information on him, so the fact that we didn't have any information on him and he was one of their strikes, was a cause of concern for us.

> The trial court rejected the *Batson* challenge following counsels' exchange, stating:

6

Okay, well, as I understand a Batson Challenge, . . . once they put forth an explanation, the burden then shifts to you, [Holly Hill], to prove that it was some type of purposeful discrimination. I don't hear that coming forward, so, for that reason the Court's going to deny your Batson Challenge as to Juror Number [11].

The trial court clarified this ruling in its order denying Holly Hill's motion for new trial, concluding that the plaintiffs had offered race-neutral reasons for striking Juror No. 11 and that the strike "was not racially based."

On appeal, Holly Hill argues that the plaintiffs' explanation for striking Juror No. 11 was facially discriminatory, which required the trial court to uphold its *Batson* challenge and disallow the strike. We disagree. "To qualify as race-neutral, an explanation need not be persuasive, plausible or even make sense. It must simply be based on something other than the race of the juror." *O'Hannon v. State*, 240 Ga. App. 706, 707 (1) (524 SE2d 759) (1999) (citation and punctuation omitted). Absent discriminatory intent inherent in the proponent's explanation, "the reason offered will be deemed race neutral." Id. (citation and punctuation omitted). See also *Toomer v. State*, 292 Ga. 49, 54 (2) (b) (734 SE2d 333) (2012) ("[T]o carry the burden of production at step two, the proponent of the strike need not offer an explanation that is concrete, tangible, or specific. The explanation need not even be case-related. The

explanation for the strike only needs to be facially race-neutral.") (citation and punctuation omitted).

The plaintiffs' explanation for the strike referenced Juror No. 11's employment, his area of residence, and the lack of other information about him. These characteristics are facially race-neutral. See *Trice v. State*, 266 Ga. 102, 103 (2) (464 SE2d 205) (1995) ("The nature of a prospective juror's employment is not a characteristic that is peculiar to any race.") (citations and punctuation omitted); *Smith v. State*, 264 Ga. 449, 450 (1) (448 SE2d 179) (1994) (prosecutor's belief that "all residents, black or white, of a particular neighborhood might be biased against the State's witnesses" was racially neutral). Nothing in the plaintiffs' explanation or the record associates these characteristics with race; sheet metal workers living in south Lowndes County can presumably be of any race. See *Jones v. State*, 240 Ga. App. 339, 341 (1) (523 SE2d 402) (1999) (prosecutor's fear that prospective juror might be "overly sympathetic" to the defendant was facially race-neutral because "people of any race can experience hardships in life"). Compare *Congdon v. State*, 262 Ga. 683, 684-685 (424 SE2d 630) (1993) (decision to peremptorily strike jurors "because they were black residents of Ringgold" was not race-neutral).

We recognize that plaintiffs' counsel expressed a belief that individuals from south Lowndes County might not be "friendly towards" an African-American claimant. But the explanation for the strike did not reference the race of south Lowndes County residents or Juror No. 11. It was race-neutral as to them. And although the trial court *could* have determined in addressing the third *Batson* prong that counsel's explanation was pretextual, "the trial court's decision on the ultimate question of discriminatory intent represents a finding of fact of the sort accorded great deference on appeal." *Smith*, supra at 451 (1) (citation omitted). We discern no clear error in the trial court's conclusion, based on the totality of the circumstances, that Holly Hill failed to prove racially discriminatory intent with respect to the strike of Juror No. 11. See id. at 450-451 (1) (noting that a peremptory strike based upon where a prospective juror resides raises "concerns about the potential for cloaking discriminatory motives in only marginally neutral justifications," but finding that the trial court did not clearly err in deeming the strike race neutral). This claim of error, therefore, does not require reversal.

2. Holly Hill further argues that the trial court erred in denying its motion for directed verdict on plaintiffs' negligent staffing claim. A trial court may direct a verdict only "[i]f there is no conflict in the evidence as to any material issue and the

evidence introduced, with all reasonable deductions therefrom, [demands] a particular verdict[.]" OCGA § 9-11-50 (a). In reviewing the trial court's ruling on a motion for directed verdict, we construe "the evidence and any doubts or ambiguities in favor of the party opposing the motion[.]" *Strickland v. Hosp. Auth. of Albany/Dougherty County*, 241 Ga. App. 1, 3 (1) (b) (525 SE2d 724) (1999) (citation and punctuation omitted).

With respect to staffing, the plaintiffs alleged at trial that Holly Hill negligently failed to staff the October 25, 2012 night shift with someone who could have properly assessed Bobby's condition. Though the plaintiffs couched this claim in terms of ordinary negligence, Holly Hill countered that the staffing decision required professional nursing judgment, bringing the claim within the realm of professional negligence that had to be – but was not – supported by expert testimony. The trial court rejected Holly Hill's argument and denied its motion for directed verdict. See *Dent v. Memorial Hosp. of Adel*, 270 Ga. 316, 318 (509 SE2d 908) (1998) (whether negligence alleged by plaintiffs constituted ordinary negligence or professional malpractice is a question of law for the trial court). We find no error.

Kaye Frazier testified that she was responsible for scheduling Holly Hill's staff, which included Certified Nursing Aides ("CNAs"), LPNs, and RNs. CNAs are staff

10

members who assist residents with daily living tasks, such as bathing and eating. CNAs report to LPNs, who, in turn, report to RNs. Although LPNs are licensed nurses, they are not qualified to perform certain functions that RNs are trained to perform, such as assessing a patient's condition and arriving at a nursing diagnosis that "identifies the nature of the problem from a nursing standpoint and the suspected causes."

For the night shift beginning on October 25, 2012, Frazier assigned three LPNs to work at the facility. As was routine at the time, RNs were not scheduled to work the night shift, and no nurse on duty was qualified to perform an independent nursing assessment of a resident's medical condition. Frazier explained that governmental regulations only required Holly Hill to have an RN in the facility eight consecutive hours per day. She chose to staff the facility with an RN during the day shift, rather than the night shift, "because at night most of the residents are asleep." She also admitted, however, that Holly Hill was required to staff above the governmental minimum requirements if necessary to meet patient needs.

Holly Hill's corporate representative testified that staffing decisions were made "based on historically what has been done and then based on the judgment of the nurses who are at the facility and particularly Ms. Frazier, as to what staff members

11

they need and where." According to the representative, Frazier determined the numbers and types of staff to place on each Holly Hill unit based on her knowledge and nursing judgment. But the representative conceded that these decisions were made in collaboration with the facility administrator, who "is responsible overall for the operation of the facility." The evidence further showed that "RNs cost the facility more than LPNs" because the hourly rate for an RN is greater than that for an LPN.

"Claims of allegedly negligent administrative acts which do not require professional knowledge or skill assert ordinary negligence." *Peterson v. Columbus Med. Center Foundation*, 243 Ga. App. 749, 754 (2) (533 SE2d 749) (2000) (citation omitted). Holly Hill offered evidence that Frazier exercised her professional judgment when making staff shift assignments. The facility administrator, however, also participated in staffing decisions. And Holly Hill has cited no evidence that the overall determination regarding how many RNs were available for Frazier to schedule was made by a medical professional or constituted a medical decision, rather than a business decision based on the higher cost of paying RNs.

The evidence demonstrated that LPNs were not trained to assess the condition of residents such as Bobby, that Holly Hill routinely elected not to employ an RN on the night shift, and that nursing home residents "can get sick any time of the day or

12

night." Plaintiffs also offered expert testimony that the delay in assessing Bobby caused his condition to progressively worsen, contributing to his suffering and the "downward quick spiral that . . . ultimately [led] to his death." Given these circumstances, the evidence supported the conclusion that Holly Hill engaged in business-related *ordinary* negligence by forcing Frazier to choose only one shift in which to schedule an RN, leaving the night shift staff without anyone trained to adequately evaluate residents. Because this staffing claim did not sound in professional negligence, the trial court properly denied Holly Hill's motion for directed verdict. See *Upson County Hosp. v. Head*, 246 Ga. App. 386, 391 (1) (540 SE2d 626) (2000) (claims sound in ordinary negligence when stated against hospital based on the acts or omissions of (1) employees who were not medical professionals and (2) medical professionals who were not exercising medical judgment); see also *Lamb v. Candler General Hosp.*, 262 Ga. 70, 71 (1) (413 SE2d 720) (1992) ("A hospital owes to its patients only the duty of exercising ordinary care to furnish equipment and facilities reasonably suited to the uses intended and such as are in general use under the same, or similar, circumstances.") (citations and emphasis omitted). Compare *St. Mary's Health Care Sys. v. Roach*, 345 Ga. App. 274, 278 (1) (811 SE2d 93) (2018) (execution of hospital policy regarding availability of

13

radiologists on night shift involved exercise of professional judgment because policy explicitly allowed immediate consult with on-call radiologist, and emergency room physician elected not to consult with radiologist after reviewing x-ray herself).

*Case No. A19A1553*

3. In their cross-appeal, the plaintiffs argue that the trial court erred in allowing the jury to consider whether to apportion fault to non-parties at the trial. Pursuant to OCGA § 51-12-33 (c), "the trier of fact shall consider the fault of all persons or entities who contributed to the alleged injury or damages, regardless of whether the person or entity was, or could have been, named as a party to the suit." According to the plaintiffs, the trial court should have granted their motion for directed verdict on apportionment as to Moss, Shannon, and SGMC because no competent evidence supported a finding that these non-parties contributed to the plaintiffs' damages.[2] See *Southwestern Emergency Physicians v. Quinney*, 347 Ga. App. 410, 427 (4) (819 SE2d 696) (2018) ("[T]he fault of a non-party cannot be considered for the purposes of apportioning damages without some competent evidence that the nonparty in fact

---

[2] The plaintiffs do not challenge the jury's decision to apportion fault to Tywon.

14

contributed to the alleged injury or damages.") (citation and punctuation omitted). We disagree.

Viewed favorably to Holly Hill, the party opposing the motion for directed verdict, see *Strickland*, supra, the evidence showed that Moss, Shannon, and a team of providers treated Bobby after he arrived at SGMC. Holly Hill's expert testified that Moss, Shannon, and the SGMC team breached the standard of care by failing to timely order necessary CT scans of Bobby's abdomen and, once the scans were finally ordered, cancelling those scans, leaving Bobby to languish in the emergency room for hours without proper assessment of his condition. According to Holly Hill's expert, Shannon and SGMC also breached the standard of care by not immediately treating Bobby with antibiotics. Holly Hill's expert asserted that each breach was egregious and individually caused Bobby's death, which resulted from the "negligent care that he received at [SGMC]." Such testimony provided some evidence that Moss, Shannon, and the SGMC providers breached the standard of care when treating Bobby, contributing to his injuries and, ultimately, his death.

On appeal, the plaintiffs argue that Holly Hill's evidence failed to meet the heightened negligence standard applicable to emergency room situations. We recognize that in medical malpractice actions "arising out of the provision of

15

emergency medical care in a hospital emergency department," physicians and health care providers cannot be held liable "unless it is proven by clear and convincing evidence that the physician or health care provider's actions showed gross negligence." OCGA § 51-1-29.5 (c). But the term "emergency medical care" does not include "medical care or treatment that occurs after the patient is stabilized and is capable of receiving medical treatment as a nonemergency patient[.]" OCGA § 51-1-29.5 (a) (5). And Holly Hill's expert testified that Bobby's condition stabilized in the emergency room, at which point a CT scan should have been conducted. Shannon (the emergency room physician) further indicated that Bobby was retained in the emergency department for a period simply because a bed was not available in the hospital's intensive care unit. Such testimony raised a question of fact as to the applicability of OCGA § 51-1-29.5 (c). The trial court, therefore, properly submitted the issue to the jury. See *Bonds v. Nesbitt*, 322 Ga. App. 852, 855-856 (1) (747 SE2d 40) (2013) (doctor's determination that patient was stable raised a jury question as to whether the patient "at some point had stabilized and was capable of receiving medical treatment as a nonemergency patient within the meaning of OCGA § 51-1-29.5 (a) (5)") (punctuation omitted).

16

Moreover, assuming OCGA § 51-1-29.5 (c) applied, "liability [is] authorized where the evidence, including admissible expert testimony, would permit a jury to find by clear and convincing evidence that the [medical providers] caused harm by grossly deviating from the applicable medical standard of care." *Abdel-Samed v. Dailey*, 294 Ga. 758, 765 (3) (755 SE2d 805) (2014) (citation omitted). Holly Hill's expert asserted that the breaches of care committed by Moss, Shannon, and SGMC were egregious, resulting in the provision of "astonishingly poor care" to Bobby in the SGMC emergency room. Given this testimony, as well as evidence regarding delays in treatment, the jury would have been authorized to find by clear and convincing evidence that these non-party medical providers acted with gross negligence. See id. at 765-767 (3) (evidence that emergency room physician waited hours to contact and transfer patient to surgeon for emergency hand surgery raised jury question as to whether physician acted with gross negligence under OCGA § 51-1-29.5).

The record evidence raised jury questions as to whether the independent actions of Moss, Shannon, and SGMC contributed to the damages suffered by the plaintiffs. Under these circumstances, the plaintiffs were not entitled to a directed

17

verdict on the fault allocation issue, and the trial court properly asked jurors to assess the individual fault of these non-parties under OCGA § 51-12-33.[3]

4. Alternatively, the plaintiffs argue that even if the trial court properly submitted the apportionment issue to the jury, the special verdict form was confusing because it listed the four non-parties (Moss, Shannon, SGMC, and Tywon) on separate lines, allowing an individual assignment of fault as to each. In plaintiffs' view, Moss and SGMC were – at most – *vicariously* liable for the actions of Tywon and Shannon. "[G]enerally, where a party's liability is solely vicarious, that party and the actively-negligent tortfeasor are regarded as a single tortfeasor." *Trabue v. Atlanta Women's Specialists*, 349 Ga. App. 223, 231 (2) (825 SE2d 586) (2019) (citation and punctuation omitted). Citing this principle, the plaintiffs claim that Moss and SMGC should not have been listed separately on the verdict form. As found in Division 3, however, Holly Hill offered evidence that these non-parties independently breached

---

[3] Citing *Amu v. Barnes*, 286 Ga. App. 725 (650 SE2d 288) (2007), aff'd, 283 Ga. 549 (662 SE2d 113) (2008), the plaintiffs argue that apportionment is inappropriate because "Holly Hill remain[s] accountable for [any] subsequent malpractice" that occurred at SGMC. The *Amu* decision, however, involved intervening negligent actors, not apportionment under OCGA § 51-12-33. See *Amu, supra* at 731-735 (2). It has no application here.

18

the standard of care owed to Bobby and proximately caused damage to the plaintiffs. This argument, therefore, lacks merit.

The plaintiffs further note that the jury apportioned the same amount of fault to Moss and Tywon (35 percent) and the same amount to SMGC and Shannon (5 percent). They claim that the jury necessarily found Moss and SGMC only vicariously liable, but that the structure of the verdict form confused jurors, causing them to improperly apportion independent fault to them. Again, however, jurors were authorized to find these non-parties independently at fault, and "we cannot go behind the jury's verdict to determine how the damages were apportioned." *City of Gainesville v. Waters*, 258 Ga. App. 555, 558 (2) (574 SE2d 638) (2002).

Moreover, the plaintiffs' objection to the verdict form at trial focused on their claim that, as a matter of law, Moss, Shannon, and SGMC were not independently at fault and thus should not have been listed separately as non-parties subject to apportionment. The plaintiffs have not cited – and we have not located – any evidence that they requested that the verdict form delineate whether jurors found the non-parties at fault based on direct versus vicarious liability. Although plaintiffs' counsel reacted at trial to the jury's verdict by "wonder[ing]" whether the fault assigned to Moss was derivative of Tywon's actions, he did not object or request any

action by the trial court to clarify the jury's verdict. To the extent the plaintiffs now argue that the verdict form was confusing and/or misleading because it failed to properly distinguish the basis for the jury's apportionment determination, that claim has been waived. See *Auto-Owners Ins. Co. v. Dolan*, 342 Ga. App. 179, 182 (2) (803 SE2d 104) (2017) ("In the absence of . . . specific and timely objections, a party waives error relating to the manner in which questions on a special verdict form are submitted to the jury.") (citation and punctuation omitted).

*Judgment affirmed. McFadden, C. J, and McMillian, P. J., concur.*