**THIRD DIVISION**
**DOYLE, P. J.,**
**REESE and BROWN, JJ.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
https://www.gaappeals.us/rules

*DEADLINES ARE NO LONGER TOLLED IN THIS COURT. ALL FILINGS MUST BE SUBMITTED WITHIN THE TIMES SET BY OUR COURT RULES.*

**June 22, 2021**

# In the Court of Appeals of Georgia

A21A0413. CONNIE v. GARNETT.

BROWN, Judge.

Keyla Connie filed this medical malpractice suit against Doctors Hospital of Augusta, LLC ("DHA"), HCA Holdings, Inc., William S. Hiltz, M.D., and Robert P. Garnett, M.D.[1] The trial court granted summary judgment in favor of Garnett, and Connie now appeals. She also appeals the trial court's denial of her motion to add Melissa Turner, a physician assistant who treated her, as a party-defendant and the grant of Turner's special appearance motion to dismiss. For the reasons explained below, we affirm the trial court's order denying Connie's motion to add Turner as a party-defendant, but reverse the grant of summary judgment in favor of Garnett.

---

[1] HCA Holdings, Inc., Hiltz, and DHA were subsequently dismissed from the action and are not parties to this appeal.

The underlying facts of this case are largely undisputed. Connie, a 29-year-old woman, presented to the DHA emergency room on the night of October 11, 2014, with complaints of acute lower right leg pain. She reported the pain as a nine out of ten. She was evaluated by Turner, a physician assistant, and the physical examination showed bilateral pulses/normal pulses. Turner ordered a venous duplex ultrasound based on suspicion of possible deep vein thrombosis ("DVT"). Dr. Hiltz reviewed the results and found no evidence of DVT. After believing she found no evidence of blood clots, Turner prescribed pain medication, discharged Connie, and advised her to follow up with her physician. It appears from the record that while Garnett was on shift, he was not present when Turner treated Connie, but he later reviewed and signed Connie's medical chart as Turner's supervising physician.

Three days later, Connie presented to Augusta University Medical Center with swelling and discoloration in her right foot and worsening foot pain. She was diagnosed with right lower extremity ischemia and underwent an open tibial thrombectomy that day. Ten days after the thrombectomy, Connie again presented to DHA with a "cool to the touch," discolored right foot. Connie's foot was ultimately partially amputated in December 2014.

Connie filed her initial complaint in June 2016, alleging that the pulse exam and venous duplex ultrasound performed "were neither appropriate nor sufficient means of determining whether [she] was contending with a serious arterial dysfunction," and that under the circumstances the defendants should have performed or ordered an arterial duplex scan and/or Doppler probe of her arterial system. On October 7, 2016, Connie filed a second amended complaint naming Turner as a defendant, but Connie neither filed a motion to add Turner as a party nor sought leave from the trial court to file the amended complaint. Connie failed to serve Turner before the statute of limitation expired on October 11, 2016.[2] In November 2016, Turner filed a special appearance answer and motion to dismiss, asserting that Connie failed to move to add her as a party and to obtain leave of the court to do so prior to filing the second amended complaint as required by OCGA § 9-11-21, and that the statute of limitation barred Connie's claims. Turner alternatively contended that even if she had been properly added to the action, there was an insufficiency of process and

---

[2] A medical malpractice action must be brought "within two years after the date on which an injury or death arising from a negligent or wrongful act or omission occurred." OCGA § 9-3-71 (a).

3

service of process warranting dismissal.[3] Connie moved to add Turner as a party-defendant for the first time on December 19, 2016.

Following a hearing, the trial court issued a detailed order denying Connie's motion and granting Turner's motion to dismiss the complaint against her, finding that Turner did not receive notice of the institution of the action prior to the expiration of the statute of limitation and that Turner did not know nor should she have known that, but for a mistake by Connie concerning her identify, she would have been a defendant in the case.[4]

Garnett filed a motion for summary judgment which the trial court granted after a hearing. In its order, the court found that Connie "failed to produce sufficient evidence showing Dr. Garnett violated the standard of care or that the alleged negligence was the cause of [Connie's] damages." Connie appeals from this order and the trial court's order denying her motion to add Turner as a party.

---

[3] In November 2016, Connie attempted to serve Turner with the second amended complaint and summons, but the summons with which Turner was served was the summons issued with the original complaint and did not list her as a party.

[4] The trial court certified its order for immediate review, but this Court denied the application for interlocutory review.

1. Connie contends the trial court erred in denying her motion to add Turner as a party. As this Court previously has explained, "an amendment to a complaint adding a new party without first obtaining leave of the court is without effect." *Wright v. Safari Club Intl.*, 322 Ga. App. 486, 494 (5) (745 SE2d 730) (2013). While Connie filed her second amended complaint adding Turner as a party-defendant within the statute of limitation, it was without leave of the trial court and thus was without effect. "Where, as here, the party would be added after the running of the statute of limitation, it must be determined whether under OCGA § 9-11-15 (c) the claim against the new party relates back to the date of the original pleading." (Citation and punctuation omitted.) *Callaway v. Quinn*, 347 Ga. App. 325, 329 (2) (819 SE2d 493) (2018). Under OCGA § 9-11-15 (c), an amended complaint adding a new party after the running of the statute of limitation may relate back to the date of the original complaint if the following three elements are satisfied:

> (1) That the amendment adding the new defendant arise out of the same facts as the original complaint; (2) That the new defendant had sufficient notice of the action; and, (3) That the new defendant knew or should have known that, but for a mistake concerning his identity as a proper party, the action would have been brought against him.

*Cobb v. Stephens*, 186 Ga. App. 648, 649-650 (368 SE2d 341) (1988). "A trial court's decision as to whether a party should be added to a lawsuit lies in the court's sound discretion and will be overturned on appeal only upon a showing of abuse of that discretion." (Citation and punctuation omitted.) *Rasheed v. Klopp Enterprises*, 276 Ga. App. 91, 92 (1) (622 SE2d 442) (2005).

There is no issue regarding the first relation-back element — Connie's claims against Turner arose out of the occurrence set forth in the original complaint, that is, the medical treatment Connie received on October 11, 2014. As to the second element, Turner averred that she had no notice of the lawsuit until after the statute of limitation had run. Connie claims that Turner's role as a physician assistant was "unequivocally connected and intertwined" with Garnett's role as her supervising physician, and thus notice to Garnett was tantamount to notice to Turner. Connie relies on two cases in which the wrong corporate defendant was sued to support her proposition that notice as to one defendant is notice to a related defendant. However, those cases are distinguishable from the facts at hand.

In *Fontaine v. Home Depot, Inc.*, 250 Ga. App. 123 (550 SE2d 691) (2001), the plaintiff fell at a Home Depot facility. The plaintiff sued "Home Depot, Inc." instead of the actual property owner, "Home Depot U. S. A." Id. Because both Home Depot,

Inc. and Home Depot U. S. A. occupied portions of the building in which the plaintiff fell, had the same registered agent, used the title "Home Depot" generically in their briefs, and because Home Depot U. S. A. had notice of the claim based on the shared registered agent, this Court found that an amended complaint adding Home Depot U. S. A. related back to the original complaint. Id. at 124-126. We even noted our own "difficult[y] to identify whether an attorney's, deponent's, or affiant's reference to 'Home Depot' refer[red] to The Home Depot, Inc. or Home Depot U.S.A." Id. at 124.

In *Rasheed*, supra, the plaintiff was injured when his car was struck by a commercial van. 276 Ga. App. at 92 (1). Klopp Enterprises insured the van, and Easy T. V. was listed as an additional insured. Id. at 92-93 (1). The plaintiff believed Klopp Enterprises employed the van's driver and filed suit against Klopp. Id. In fact, the driver was employed by Easy T. V., which was a subsidiary of Klopp. Id. at 93 (1). Both entities were owned by the same, single shareholder who served as the chairman of the board for both businesses. Id. Both companies also had the same president and registered agent, operated out of the same office, and were represented by the same attorney in the litigation. Id. Under those circumstances, we found that Easy T. V. — the proper defendant — had notice of the claim when Klopp Enterprises was served. Id.

Neither of these cases stands for the proposition that notice of the lawsuit to Garnett can be construed as notice to Turner. Rather, this case is more analogous to *Beaver v. Steinichen*, 182 Ga. App. 303 (355 SE2d 698) (1987), in which a plaintiff filed a medical malpractice action against a hospital. Id. at 304. After the statute of limitation ran, the plaintiff attempted to add as defendants two doctors involved in her care. Id. We concluded that the new complaint did not relate back under OCGA § 9-11-15 (c) because the plaintiff was not seeking to simply change parties but to commence suit against new defendants, "strangers to the action" against the hospital. Id. Here, although Garnett was Turner's supervising physician while she was employed at the hospital,[5] the two neither had a corporate affiliation nor a shared registered agent. Indeed, Turner was neither working at DHA nor supervised by Garnett at the time Connie filed her original complaint. See *St. Francis Health v. Weng*, 354 Ga. App. 310, 312 (840 SE2d 712) (2020) (the required notice is "notice of the institution of the action (i.e., notice of the lawsuit itself) and not merely notice of the incidents giving rise to such action") (citation and punctuation omitted). Given Connie's failure to come forward with any evidence showing that Turner had

[5] The record reflects that Turner had eight other supervising physicians apart from Garnett.

8

knowledge of her lawsuit before the limitation period expired, the trial court properly denied Connie's motion to add Turner as a party defendant and granted Turner's motion to dismiss the amended complaint against her.[6]

2. Connie contends that the trial court erred in granting summary judgment to Garnett, the last remaining defendant in the case. The trial court found that Connie had failed to produce sufficient evidence showing that Garnett violated the standard of care or that Garnett's alleged negligence was the cause of Connie's damages.

> Summary judgment is proper when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. OCGA § 9-11-56 (c). A de novo standard of review applies to an appeal from a grant of summary judgment, and we view the evidence, and all reasonable conclusions and inferences drawn from it, in the light most favorable to the nonmovant.

---

[6] Connie cites several cases in her brief for the proposition that "a mere lapse in time is not enough to support . . . denial of a motion to add [a] party." However, these cases are inapplicable as they did not address OCGA § 9-11-15 (c). Connie also contends that based on this Court's holding in *Preferred Women's Healthcare v. Sain,* 348 Ga. App. 481 (823 SE2d 569) (2019), she should not have been barred from adding Turner as a party-defendant simply because she was unable to serve her with process within the statute of limitation. The *Sain* case addressed only a plaintiff's ability to amend her complaint to add a party-defendant in a medical malpractice action after the five-year medical malpractice statute of repose had run, an issue different from the one at hand. Id. at 490-491.

9

(Citation and punctuation omitted.) *Beamon v. Mahadevan*, 329 Ga. App. 685, 686 (766 SE2d 98) (2014).

(a) *Standard of Care.* Connie contends that the trial court erred in granting Garnett summary judgment on the issue of standard of care because a question of fact remains as to whether she was provided "emergency medical care" such that Garnett may claim the protections of the heightened standard set out in OCGA § 51-1-29.5 (c). In an action for medical malpractice based on the provision of emergency medical care in an emergency department, Georgia law requires clear and convincing proof of a health care provider's gross negligence. See OCGA § 51-1-29.5 (c).[7] We previously have held that there are three conditions which must be present in order for OCGA § 51-1-29.5 to apply:

> (a) the lawsuit must involve a "health care liability claim"; (b) the claim must arise out of the provision of "emergency medical care"; and (c) the care must have been provided to the patient "in a hospital emergency

---

[7] OCGA § 51-1-29.5 (c) provides:
In an action involving a health care liability claim arising out of the provision of emergency medical care in a hospital emergency department or obstetrical unit or in a surgical suite immediately following the evaluation or treatment of a patient in a hospital emergency department, no physician or health care provider shall be held liable unless it is proven by clear and convincing evidence that the physician or health care provider's actions showed gross negligence.

10

department or obstetrical unit or in a surgical suite immediately following the evaluation or treatment of a patient in a hospital emergency department."

(Citation and punctuation omitted.) *Southwestern Emergency Physicians v. Nguyen*, 330 Ga. App. 156, 158 (1) (767 SE2d 818) (2014). The statute further specifically excludes from the definition of emergency medical care "care or treatment that occurs *after* the patient is stabilized and is capable of receiving medical treatment as a nonemergency patient or care that is unrelated to the original medical emergency." (Emphasis supplied.) OCGA § 51-1-29.5 (a) (5). Here, it is undisputed that Connie's complaint raises a "health care liability claim" and that she received treatment in "a hospital emergency department." Connie contends, however, that a question of fact remains as to whether she was stable at the time she was discharged from the DHA emergency room. We agree.

In support of her claims, Connie submitted the affidavits of a vascular surgeon and an emergency room physician. With regard to the timing of the alleged professional negligence, one of Connie's experts opined in an affidavit attached to her complaint that her emergency room provider "should have, upon learning of her symptoms [and her history of lupus], immediately performed or advised another

11

facility or caregiver to perform not just a venous scan, but an arterial duplex scan and/or handheld Doppler probe of Ms. Connie's arterial system." The other expert also opined that such a scan or probe should have been performed or directed to be done "immediately" upon learning of her symptoms, history of lupus, and "history of lower extremity numbness and color change." While one of Connie's experts testified that when she presented to the DHA emergency room on October 11, it was an emergency situation needing "emergent medical care," neither expert's testimony addressed whether Connie at any point became "capable of receiving medical treatment as a nonemergency patient." In fact, the record reflects that although Connie reported her pain at a nine out of ten when she presented to the emergency room, records from her emergency room visit show that she reported her pain at an intensity of "3" before discharge. Turner testified that "based on [Connie's] history and [Turner's] physical assessment," she determined that Connie "was not in any distress, that her arterial circulation was intact." She further testified that she understood emergent conditions to mean "threatening of life, limb, or eyesight. And I would say this was not any of that." The emergency room records also show that Connie's condition had "improved" before she was discharged. Connie, however, testified that upon discharge her pain had not improved and was at a ten out of ten;

12

she disputed the reports of her pain level and readiness to go home in the emergency room records.

In evaluating whether the patient has "stabilized" such that the care or treatment provided to the patient does not qualify as "emergency medical care" under the statute, "the condition of the patient controls, not the opinion of the physician." *Bonds v. Nesbitt*, 322 Ga. App. 852, 855 (1) (747 SE2d 40) (2013). Thus, if a health care provider

> mistakenly concludes that a patient has become "stabilized" and "capable of receiving medical treatment as a nonemergency patient" and therefore stops providing emergency care to that patient — notwithstanding that the patient still needs emergency care — and if the patient is injured or killed as a result of the withdrawal of emergency care, the physician or health care provider is entitled to claim the protection of the gross negligence standard.

Id. Here, Turner's determination that Connie was not in any distress and that her condition had improved while she was in the emergency room is some evidence that Connie was in fact stabilized. Id. However, as already stated, "the condition of the patient controls, not the opinion of the physician." Id. at 855 (1). Connie disputed that her pain level had decreased from a ten out of ten and that she had improved to the point that she was ready to be discharged. And, both of her experts testified that she

13

required emergency treatment "immediately." In light of the conflicting evidence on this point, we conclude that whether Connie at some point had stabilized and was capable of receiving medical treatment as a nonemergency patient within the meaning of OCGA § 51-1-29.5 (a) (5) is a question for the trier of fact. See *Howland v. Wadsworth*, 324 Ga. App. 175, 180-181 (2) (749 SE2d 762) (2013) (question of fact as to whether patient presenting to emergency room with complaints of pain in feet, difficulty walking, feet cold to touch, and palpable pulses had stabilized within meaning of OCGA § 51-1-29.5 (a) (5); physician assistant ordered venous ultrasound examinations but no arterial ultrasound or other tests to rule out arterial occlusion). See *Bonds*, 322 Ga. App. at 855-856 (1) (summary judgment not appropriate because question of fact remained as to whether patient's condition stabilized such that gross negligence standard did not apply; plaintiff's expert witness testified that patient's condition never became stable while he was in the emergency room but treating physician determined that patient's condition had improved and patient could be transferred to a regular hospital room). Compare *Quinney v. Phoebe Putney Mem. Hosp.*, 325 Ga. App. 112, 113-115, 115-117 (1) (751 SE2d 874) (2013) (gross negligence standard applied to plaintiff's claims where evidence showed that patient was unable to walk, reported pain at a nine out of ten, remained symptomatic with

worsening pain and vital signs despite administration of pain medication, and was transported by ambulance to another medical center). Thus, the trial court erred in granting Garnett summary judgment on the issue of standard of care.

(b) *Causation.* Connie also contends that the trial court erred in granting summary judgment in favor of Garnett on the basis of causation. Again, we agree.

"To recover in a medical malpractice case, a plaintiff must show not only a violation of the applicable medical standard of care but also that the purported violation or deviation from the proper standard of care is the proximate cause of the injury sustained." (Citation and punctuation omitted.) *Knight v. Roberts*, 316 Ga. App. 599, 603 (1) (730 SE2d 78) (2012).

> Causation is established through expert testimony because the question of whether the alleged professional negligence caused the plaintiff's injury is generally one for specialized expert knowledge. The expert must state his or her opinion regarding proximate causation in terms stronger than that of medical possibility — e.g., a reasonable degree of medical certainty or reasonable medical probability. The use of the magic words "reasonable degree of medical certainty" is not required and causation may be established by linking the testimony of several different experts.

(Citations and punctuation omitted.) *Swint v. Mae*, 340 Ga. App. 480, 482 (1) (798 SE2d 23) (2017). "[Q]uestions regarding proximate cause are undeniably a jury question and may only be determined by the courts in plain and undisputed cases." (Citation and punctuation omitted.) *Pruette v. Phoebe Putney Mem. Hosp.*, 295 Ga. App. 335, 338 (1) (671 SE2d 844) (2008).

According to both of the expert affidavits submitted by Connie, the health care providers at DHA should have known that her history of lupus placed her at a higher risk of developing arterial occlusion and that a pulse exam is not always reliable. Both opined that it was their

> opinion to a reasonable degree of medical certainty that had Dr. Hiltz, Dr. Garnett, or any of Doctor[ ]s Hospital's physicians and staff performed or directed another caregiver to perform an arterial duplex scan or a handheld Doppler probe of [Connie's] arteries, or at the very least referred her to a vascular surgeon, it is highly likely that the right extremity arterial blockage would have been detected and removed before ischemia developed to the point to where a substantial amount of tissue became non-viable.

The emergency surgeon further opined that Turner's failure "to make any notations in [Connie's] records demonstrating that she asked [Connie] about the presence or absence of color changes in the affected foot or toes constituted a deviation from the

16

standard of care"; that Garnett, as Turner's supervising physician, "was responsible for any acts or omissions" of Turner and had Garnett "more diligently supervised, scrutinized, and reviewed [her] examinations and findings, as well as followed up with [Connie] in person based on her symptoms, the arterial blockage . . . would have been timely discovered and removed . . ."; and that "but for the three-day delay between [Connie's] initial visit . . . and . . . discovery of the arterial blockage, the . . . amputation she underwent would not have been necessary." The emergency surgeon testified that simply performing a pulse test was not a diagnostic test that could be used to rule out arterial occlusion, and that the venous duplex ultrasound ordered, while appropriate to diagnose DVT, was not the appropriate diagnostic test to rule out arterial occlusion.

Based on the affidavits and testimony, a jury question was presented as to causation. More specifically, "[t]o the extent that the delay caused by [the] misdiagnosis contributed to the delay in [Connie's] ability to receive timely treatment and surgical intervention, a jury question as to the element of causation existed." *Knight*, 316 Ga. App. at 607 (1) (a) (concluding that a jury issue as to causation existed based upon combined expert testimony that if emergency room physician had ordered the appropriate diagnostic tests, patient's aortic dissection, which

17

progressively worsened over time, would have been discovered and her death could have been prevented); *MCG Health v. Barton*, 285 Ga. App. 577, 583-584 (2), (3) (647 SE2d 81) (2007) (affirming the denial of defendant's motion for summary judgment since a jury question regarding causation existed based upon expert testimony that the physician's delay in diagnosing the patient's torsion condition prevented emergency surgery to salvage the patient's testicle).

Garnett contends that both "experts were asked in their respective depositions whether anything would have changed if the care and treatment on October 11 would have been different" and neither was "able to say that, more likely than not, [Connie] would have kept her toes if she had not been discharged [from DHA on October 11]." Even if the record were to support this characterization of the experts' deposition testimony, it does not entitle Garnett to summary judgment on the issue of causation. Focusing only on such testimony would ignore the experts' affidavits, and even if the affidavits contradict the experts' deposition testimony, such "[c]ontradictions go solely to the expert[s'] credibility, and are to be assessed by the jury when weighing the expert[s'] testimony." (Citation and punctuation omitted.) *Naik v. Booker*, 303 Ga. App. 282, 286 (692 SE2d 855) (2010) (appellate court could not resolve conflict between expert's affidavit and expert's deposition testimony regarding whether

patient would have survived had physician-defendant surgically intervened). See also *Thompson v. Ezor*, 272 Ga. 849, 853 (2) (536 SE2d 749) (2000).

*Judgment affirmed in part and reversed in part. Doyle, P. J., and Reese, J., concur.*